WILLIAM ROBERTSON, and thirteen others, members of the church in full communion, known as the Associate Congregation of Cambridge, adhering to the principles of the Associate Presbytery of Pennsylvania formerly, now the Associate Synod of North America,

*vs.*

ALEXANDER BULLIONS, JAMES COULTER, JAMES SHILAND, ROBERT MCLELLAND, PETER HILL, and the Associate Congregation of Cambridge adhering to the Associate Presbytery of Pennsylvania formerly, now the Associate Synod of North America.

The late court of chancery in this state, had no power to remove an officer of a religious corporation ; or to disfranchise a member thereof; or to interfere with, or control, directly or indirectly, the election of its officers ; or to declare their election void.

Robertson *v.* Bullions.

Nor had that court power to disfranchise a member by declaring that he did not possess the necessary qualifications; that power, if it exist at all, being vested in another tribunal.

The court of chancery, in many cases, and by virtue of its general jurisdiction over them, may enforce trusts; and when a corporation acts merely as a trustee and abuses the trust, it can be divested of it. But the court can not take from a religious corporation its own property nor the management of it from its trustees duly elected, nor divest the latter thereof, nor take it out of their possession.

The court may interfere to a certain extent, on account of a misapplication of the funds belonging to a religious corporation. But that is on the ground of a breach of contract, express or implied.

All power of interference with churches, religious societies, or religious corporations, by the civil courts in this state, must be referred to the rights of property. *Per* HAND, J.

The trustees of a religious society, incorporated under the statute, may be restrained by a court of equity from wasting the property of the society, and from such management of it, as unreasonably and unconscientiously deprives the society, or some part of it, of the enjoyment thereof:

They may also be restrained from applying such property to the promotion of tenets clearly opposed and adverse to the fundamental principles of the faith and doctrines professed by the church or society, at the time the corporation acquired the property.

But the exercise of this jurisdiction should generally be restrictive, and not mandatory; the statute being the guide and authority of the trustees for the future, and allowing the exercise of a wide discretion and religious freedom.

A court of equity has power, upon the application of a portion of the corporators in a religious society, to restrain the trustees of the society from applying the temporalities of the corporation, to the support of a person as minister, who has been deposed from the ministry, by the proper ecclesiastical tribunal, and who is still under sentence of deprivation.

There is no power in the state, legislative, executive, or judicial, which can interfere with the complete religious liberty secured by the constitution. *Per* HAND, J.

Custom or usage can not avail against the provisions of a statute. *Per* HAND, J.

A deed was given in 1786, by A. to seven persons, described as trustees of a religious society, known as the Associate Congregation of Cambridge, &c., and to them and "their successors forever, to the sole and only proper use, benefit and behoof" of said society, expressing a consideration of £6, and with a covenant for such further assurance as might be necessary to vest the land in them or their successors for such use, but reserving no power or authority in the grantor to revoke or alter the same. A second deed was given by A. 24 years after the first, (the society having in the meantime possessed and improved the property,) to 14 persons, three of whom were named as grantees in the first deed, described as trustees of the same associate congregation, to them, their heirs and assigns forever, for the use and in trust for those who then were, or there-

Robertson *v.* Bullions.

after might be, in full communion with, and should compose the associate congregation, &c. This deed recited, among other things, that the society was not incorporated at the time the first deed was given, and that said 14 persons had been elected trustees to manage and take care of the temporalities of the said Associate Congregation, and that doubts had arisen whether the title was completely vested in the members who then were, or thereafter might be, in full communion with and compose said congregation, and in such persons as they had elected or might elect trustees, and that the grantor was willing to remove all doubts, and to confirm the title in those who should be in full communion, &c., and in and to such persons as they had elected or might thereafter elect trustees, and their successors in office to be elected and chosen forever thereafter. It was *Held* that the second deed was inoperative as a new conveyance, the grantor, certainly in equity, having no interest or estate which he could convey; and having no power to alter the nature of the trust, or change the *cestuis que trust,* even with the consent of the grantees in the first deed. CADY, J. *dissented.*

*Held also,* that the real estate so conveyed in 1786, became legally and equitably the property of the corporation, on the society becoming incorporated in 1826, under the 3d section of the act for the incorporation of religious societies.

The grantor in a deed to a religious corporation, may, undoubtedly, make a connection of the corporation with a particular body or church judicatory, a condition of the grant. And the corporate or denominational name may indicate the nature of the trust as to doctrines esteemed fundamental. But a description of the grantees as being trustees of a church at that time in connection with a particular presbytery or synod, or as having a specified person for a minister, does not amount to a condition, that the church or society shall remain in connection with that particular church judicatory, or to a limitation of the estate conveyed to that effect. CADY, J. *dissented.*

Except as to the cardinal points of doctrine, such a clause in a conveyance, will be held to be merely descriptive of the grantees and as designating the denomination of the church, and as admitting that it has connection with such a presbytery or synod at the date of the deed.

The support of particular doctrines or systems of worship or government, or a connection with some particular church judicatory, may be made a condition in a grant or donation to a religious society. But if no such condition be expressed, none should be implied, except as to cardinal points.

Corporations organized under the 3d section of the act to provide for the incorporation of religious societies, are not what are technically known in law as " ecclesiastical corporations;" they not being entirely spiritual, nor subject to ecclesiastical courts, nor to the visitatorial power of the ordinary. Nor has any person or officer in this state, visitatorial jurisdiction over them. *Per* HAND, J.

And it seems they are not eleemosynary; but possess the nature and qualifications of private civil corporations, created mainly for the purpose of aiding in the promotion and enjoyment of religion, by managing the property of the church. *Per* HAND, J.

Robertson v. Bullions.

A church may be, 1. A temple or building consecrated to the honor of God and religion ; or 2d. An assembly of persons united by the profession of the same christian faith, met together for religious worship.  *Per* HAND, J.

In our statute, respecting the incorporation of religious societies, the word "church" is used in the sense of this second definition.  *Per* HAND, J.

The word " congregation," as used in that statute, means an assembly met, or a body of persons who usually meet in some stated place for the worship of God and religious instruction; and, it *seems*, it may or may not include a church or spiritual body.

The same may be said of the term " religious society," used in the same connection in the third section of the statute.

The electors in such religious society, or those persons designated by the statute as entitled to vote, are corporators.

A church or spiritual body, is authorized to call a minister, either by itself or by some other mode, according to usage.  In order to reach the revenues of the corporation, that call must be ratified by the congregation or body entitled to elect trustees, by fixing the salary of the minister; and then the trustees may (and, it seems, should) apply the revenues to his support.

The civil courts can not, upon the merits, overhale the decisions of ecclesiastical judicatories, in matters properly within their province.

The deposition of a minister is purely an ecclesiastical act.  But the effect incident to that deposition upon civil rights, is quite another thing.  No church judicatory, because of the deposition of the minister, can sequester the temporalities of the church or society or corporation ; or, where the society has been incorporated under the third section of the act, supply the pulpit, temporarily or otherwise, against the will of the trustees.

IN EQUITY.  This was an appeal to the chancellor from a decree of the vice chancellor of the fourth circuit, and came to this court in pursuance of the new constitution and the judiciary act of 1847.  In, or about the year 1754, an organization took place by which the congregations in America of the sect of Christians known as the Associate Church, under the inspection, superintendence and care of the Associate Synod of Scotland, were formed into a presbytery, styled " The Associate Presbytery of Pennsylvania," subordinate to the Associate Synod of Scotland. In 1785 a church was organized in Cambridge, in the county of Washington, in this state, and styled " The Associate Congregation of Cambridge, adhering to the Associate Presbytery of Pennsylvania."  In 1802, all connection with the church in Scotland was dissolved ; and, the churches having greatly increased, a new organization was made, and the Associate

Presbytery of Pennsylvania, divided into four presbyteries, among which was the Associate Presbytery of Cambridge;" but none by the name of the "Associate Presbytery of Pennsylvania," and a synod was organized styled the "Associate Synod of North America;" and since that, several other presbyteries have been added. The local churches of that sect are usually designated " Congregations." The complainants insisted that this term included communicants only, while the defendants claimed that it included, not only communicants, but their children and all who statedly attend divine worship with that body. On the 7th of July, 1786, Jonathan French, of Cambridge, in consideration of six pounds, as expressed in the deed, conveyed to John Blair, James Small, James Eddie, James Irvine, William McAuley, David French, and Geo. Miller, chosen and elected trustees for the Associate Congregation of Cambridge, adhering to the Associate Presbytery of Pa., and their successors forever, half an acre of land in Cambridge, *habendum*, " to the party of the second part, and to their successors forever;" to the sole and only proper use, benefit and behoof of the said Associate Congregation of Cambridge. The deed contained full covenants, including a covenant for such further assurance as should be deemed necessary to vest the land in the parties " of the second part and their successors, for the sole use of said Associate Congregation of Cambridge."

In 1810, the wife of the grantor not having signed the first deed, and it being supposed there were defects in that deed, French and his wife, by the consent of all the grantees in the first deed, as the bill stated, made another deed to "James Small, James Eddie, James Irvine, Alex. S. Kellie, sen., James Hoy, James Rolle, William Stevenson, John Robertson, Samuel Green, Alexander S. Kellie, jr., John Shiland, jr., James Hill, Alex. Livingston, and Wm. McGeoch, of said town of Cambridge, trustees for the Associate Congregation of Cambridge, in accession to the principles presently maintained by the Associate Synod of North America, and now under the inspection of the Associate Presbytery of Cambridge, belonging to the said synod, and whereof the Rev. Alexander Bullions is

the present pastor;" and after reciting the former conveyance, and that the congregation was not incorporated, and that the parties of the second part had been elected trustees thereof for the purpose of managing and taking care of the temporalities of the congregation, and that doubts had arisen whether the title to said premises was completely vested in the members who then were, or thereafter might be in full communion with and compose the congregation, and in such persons as they then had elected and chosen, or at any time thereafter might elect and choose from among themselves as trustees, and that the grantor was willing to remove all such doubts, and to confirm and secure the title to the premises, in and to the members who then were and thereafter might be in full communion with and should compose the said congregation, and in and to such persons as they then had elected, or at any time thereafter might elect and choose from and among themselves, as trustees, to take the charge and care of the temporalities of said congregation, and their successors in the office of trustees to be elected and chosen as aforesaid, forever thereafter ; and in consideration for the better vesting and confirming the title aforesaid, and of one dollar, they granted, bargained, sold, remised, released and confirmed to the parties of the second part, their heirs and assigns the premises ; *habendum* to them, their heirs and assigns forever, to the intents and for the use and in trust for the members who then were, or thereafter might be in full communion with, and should compose the said Associate Congregation of Cambridge, in accession to the principles then presently maintained by the Associate Synod of North America, and then under the inspection of the Associate Presbytery of Cambridge, belonging to said synod, and for such persons as the said members at any time thereafter might elect and choose from among themselves as trustees, and their successors in office, to be elected and chosen as aforesaid.

A house of worship was built on the land described in the deeds from French, in 1786; and in 1833, a new edifice was erected on the site of the old one, at an expense of $9000. A witness stated he believed French and all the grantees named in

Robertson v. Bullions.

the first deed from him, were now dead ; and that French was a member in communion with the church, and gave the land and something more towards building the church.

On the 24th of December, 1799, one Gilmore, for the consideration of £28, conveyed half an acre to "Alexander S. Kellie, sen., James Irvine, James Hoy, James Rolle, Samuel Green, Wm. Stevenson, and Robert Cumming, trustees for the Associate Congregaton of Cambridge, aforesaid, and their successors, in accession to the principles presently maintained, by the Associate Presbytery of Pa., and now under the inspection of said Presbytery, and to their successors forever. *Habendum* 'to the said party of the second part and their successors, for the proper use, benefit and behoof, of the said Associate Congregation of Cambridge, forever." And on the 23d day of October, 1827, Alexander Bullions and wife, for the consideration of $700, conveyed to Francis McLean, Wm. Stevenson, Wm. McGeoch, Ed. Small, John Robertson and George Lourie, " trustees of the Associate Congregation of Cambridge, of the county of Washington, and state of New-York, adhering to the principles of the Associate Presbytery of Pa. formerly, now the Associate Synod of North America, of which the Rev. Alexander Bullions is minister, and to their successors in office forever," two parcels of land, " *habendum* to the parties of the second part, and their successors in office forever." On the 9th of March, 1835, Wm. Stevenson, for the consideration of $5, conveyed another parcel to James Coulter, Wm. McGeoch, George Lourie, James T. Greene, 2d, and Peter Hill, 2d, " trustees of the Associate Congregation of Cambridge, in the county of Washington, and state of New-York, and their successors in office, adhering to the principles of the Associate Presbytery of Pa., formerly, now formed into the Associate Synod of North America, of which the Rev. Alexander Bullions is now minister, and to their successors in office, heirs and assigns forever. *Habendum* to the said parties of the second part, their successors in office, heirs and assigns, to their sole and only proper use, benefit and behoof forever in trust."

On the 21st of November, 1826, this Associate Congregation

became incorporated under the " act to provide for the incorporation of religious societies," passed April 5, 1813. In 1833, the new church was built, and the bill stated that before this suit was commenced, the Associate Congregation had built sheds and out-houses for the accommodation of the members of the congregation and others, and the real estate was said to be worth thirteen thousand dollars. Also a library and furniture for the church, and other personal property, of the value in the aggregate of $450, had been purchased. In 1808, the defendant Bullions was called and settled as pastor and minister of the congregation. The call was by " the elders and others, members of the Associate Congregation of Cambridge, in the state of New-York, in full communion, who have acceded to the Lord's cause as professed and maintained by the Associate Presbytery of Cambridge, as subordinate to the Associate Synod of North America." Upon his ordination and installation, he answered affirmatively to the following question : " Do you engage to submit yourself willingly and humbly in the spirit of meekness, to the admonition of this presbytery, as subordinate to the Associate Synod of North America, remembering that while they act uprightly, they judge not for men but for the Lord, who is also with them in the judgment; and do you promise that you will endeavor to maintain the spiritual unity and peace of this church, carefully avoiding every divisive course, neither yielding to those who have made defection from the truth, nor giving yourself up to a detestable neutrality and indifference in the cause of God, but that you will continue steadfast in the profession of the reformation principles maintained by us ; and this you promise through grace, notwithstanding any trouble or persecution you may be called to suffer in studying a faithful discharge of your duty in these matters ?"

The bill alledged that on the 12th day of April, 1838, Mr. Bullions was deposed by the Associate Presbytery of Cambridge from the office of the holy ministry, and excommunicated with the lesser excommunication, until he should repent and return to his duty in submission to the presbytery ; which sentence, on an appeal by the defendant, Bullions, to the Associate Synod

Robertson *v.* Bullions.

of North America, was affirmed in June, 1838, and he remitted back to the presbytery for further dealings; but that he never appeared before them. Also, that the office of pastor and minister was declared vacant, and the synod, for the purpose of supplying the vacancy, sent two ministers as commissioners to labor for a short season, but a majority of the trustees refused to receive them or permit them to preach, but permitted the defendant Bullions to preach, and officiate as minister. It also charged that any pretended restoration of the latter by the presbytery of Vermont, was irregular, for want of jurisdiction.

The bill was filed in March, 1839, and at that time William Stevenson, William Robertson, two of the complainants, together with Coulter, Shiland, McLelland and Hill, four of the defendants, were trustees; but it appeared that in April, 1839, James Green was elected in the place of Robertson, and in April, 1840, James Wood was elected in place of Stevenson; and Coulter, Shiland, Hill, Green, McLelland and Woods, were all adherents and supporters of the defendant Bullions.

The bill prayed that the four defendants, trustees, might be compelled to permit clergymen of good standing and in full communion with the Associate Presbytery of Cambridge and the Associate Synod of North America, and who adhere to the principles of faith, discipline and government of the Associate Church, to preach, teach, and administer divine ordinances according to the established and received doctrines of the said Associate Church, and to appropriate the property and funds to the support and maintenance of no other, and that they, together with the defendant Bullions, might account for the use of the property since the deposition of the latter; that the four defendants, trustees, be removed, and their places supplied as the court might direct, and the defendant Bullions be restrained from officiating as minister, and the trustees from permitting him to do so, in the church edifice, and from using the property for the support of any minister not in regular standing and full communion with the Associate Presbytery of Cambridge subordinate to the said Associate Synod of North America, duly called, sent and inducted as pastor of said Associate Congregation of Cam-

bridge, according to the rules and principles of faith and practice, discipline and government of said Associate Church.

In 1840 the complainants filed a supplemental bill, alledging, among other things, that all the elders, being five in number, and who still adhered to the defendant Bullions, and also the four defendants, trustees, and the other former members who still adhered to him, had been, after a due course of dealing, suspended and excommunicated with the lesser sentence of excommunication. The proofs showed that this was done or attempted to be done in 1839, after the original bill was filed. The supplemental bill, however, was ordered to be dismissed by the chancellor, on demurrer.

The bill did not waive an answer under oath.

It was insisted in the answer, *inter alia*, that the term "congregation" included not only those in full communion and their children, but all others statedly attending divine worship; and denied that a session had any power over the members of the congregation not in full communion, or over the temporalities of the church or congregation; insisted that the presbytery could not call or ordain a minister until he had been called by the church or congregation; but that the latter could invite one from sabbath to sabbath to preach; and that no presbytery could proceed to sentence or punish a member when tried, if he protests and appeals, and that an appeal stays judgment and execution, and suspends all proceedings, leaving the party to exercise all his rights. And that a decision of the synod might be reviewed, and if protested against and conscientiously believed to be erroneous and unjust, the party might continue to exercise all his functions. That this was the case with the original founders of the Associate Church, and also with the defendant Bullions. And again, that it was not necessary to appeal where the proceedings of a presbytery were void, or not within the rule of discipline and government of the church. Nor were their decisions binding unless made in accordance with the word of God and received and known principles of the church, and that subjection to the judicatories of the church is not an implicit and blind obedience, but a subjection in the

Lord, qualified and limited by the word of God and the received and known principles of the church, and that neither a synod or presbytery has any control whatever over the temporalities of the church, or over any person not in full communion. They also averred that the new church edifice was erected by subscriptions of the members of the congregation and by donations from other sources, which were paid into the hands of the trustees, without any restriction or condition, except for religious purposes, and to build the church ; and without any express or implied conditions that the trustees or congregation should remain subject to the Associate Presbytery of Cambridge further than they should deem just, expedient, and proper. That at least $6000 of the sum raised for that purpose was contributed by those who adhere to and support Dr. Bullions, comprising about 340 persons, and including 221 communicants, all the elders, and at the time of answering, all the trustees; while the complainants and those agreeing with them were not over 75 persons or over 60 communicants, and that the defendants had offered to pay the minority for their share of the property or pay back their subscriptions; but that the minority answered that they would have the whole or nothing. That the sheds, &c. were built by individuals, and the library purchased by private subscriptions. They admitted that the property, except as before stated, was held by the trustees in trust for the support and maintenance of the gospel and the administration of the divine ordinances in said congregation, according to the principles of faith, practice, discipline and government of the Associate Church of North America ; and that by those, no minister under sentence of excommunication could preach, &c. ; but if not righteously deposed and excommunicated, or if a majority of his congregation so believe, and he or they protest and decline to submit to the sentence, both minister and people may disregard it ; and insisted that this had been so from the foundation of the Associate Church. And they insisted that while the trustees could not call a minister against the will of the people, the congregation might give such call, and a synod or presbytery could not impose a minister upon them.

They admitted that the defendant Bullions was suspended by the presbytery, on the 5th of October, 1837, and deposed and excommunicated, &c. on the 12th of April, 1838; but they insisted that the proceedings of the presbytery were void for the reason that the presbytery was not legally constituted; four members being improperly and illegally excluded from seats, and that those who did sit were accusers of the defendant Bullions and witnesses against him; and that on the 7th day of February he sent a " declinature" to the authority of the presbytery, which removed all proceedings against him; that he was absent, and not legally notified; and it was the act of a minority; and that he appealed. That there was not full proof before the synod, and that the meeting of the synod at that time was thinly attended; and also that the defendant Bullions protested. That the five elders and four of the trustees and four-fifths of the congregation, continued to support him; and the defendants suffered him to preach, &c. in obedience to the wishes and directions of the congregation. And that neither he nor the congregation had departed in faith, practice or discipline from the principles of the Associate Church. They also set up his restoration by the Presbytery of Vermont.

It appeared that on the 1st day of January, 1839, the leases of the pews, which were for the term of five years, having expired, they were leased by the trustees for another term of five years, by a sale at public auction upon notice given; but the defendants admitted that the complainants and those acting with them, did not generally attend the sale or purchase of pews. The defendants declared they were only acting in obedience to the wishes and directions of the congregation; and insisted that the property had not been applied contrary to the trust.

Answers were put in by the corporation, and by the defendants individually.

A great amount of testimony was taken on both sides, much of which related to the doctrines, faith, practice, discipline and government of the Associate Church. It was also proved that the Presbytery of Cambridge, in October, 1837, suspended the defendant Dr. Bullions, and, after several meetings of the pres-

bytery, finally on the 12th of April, 1838, he was deposed from the office of the ministry and excommunicated with the lesser sentence of excommunication.

The charge against him, as testified by one of the clerical members of the presbytery, was for slander and contempt of court. The slander consisted in asserting that a member or members present on the court, were not fit to sit in any court; which the defendant Bullions stated, not of his own knowledge but as matter of common report; and, before he was suspended, another offence, "contumacy, which consisted in an obstinate refusal to submit to the censure adjudged by the court, or to be corrected according to order," was superadded. Before sentence of suspension, he gave the names of four members of the presbytery, Messrs. Anderson, Miller, A. Gordon and D. Gordon, as those to whom he referred. It appeared that the presbytery consisted of nine clergymen, Dr. Bullions, Messrs. Anderson, Miller, A. Gordon, White, Goodwillie, D. Gordon, Pringle and Stalker, beside the elders; and that at a meeting upon this subject, and to consider the petition of the Cambridge church for the restoration of Dr. Bullions, in Nov. 1837, three of them were excluded from voting; one, Mr. Pringle, having married the daughter of Dr. Bullions; and the first wife of the latter whose issue yet survive, was the sister of another, Mr. Goodwillie; and another, Mr. White, was deemed partial. And at another meeting in Dec. 1837, another, Mr. Stalker, was excluded because he had prejudged the case.

Bullions appealed to the Associate Synod, which in the same year, 1838, affirmed the decision of the presbytery and remitted the proceedings to the same for further dealing.

The vice chancellor decided that the property of the corporation, both real and personal, was dedicated to and was obtained, acquired and accumulated by the said Associate Congregation for, and ever had been, and still was held by the trustees of said congregation in trust for the sole and only and exclusive purpose of being devoted and appropriated exclusively to the support and maintenance of the preaching and teaching of the gospel and the administration of divine ordinances in said congrega-

tion, according to the principles of faith, practice, discipline and government of the Associate Church of North America ; and that according to those, no minister who is under sentence of excommunication, or deposition, could be permitted to occupy the pulpit, or administer divine ordinances in said Associate congregation of Cambridge, or any congregation of the Associate Church.   And that the appropriation of the property for the support of the defendant Bullions and his preaching, and for the use, benefit and accommodation of those adhering to him and attending upon his administrations since he was deposed, &c. was an unlawful diversion thereof from the purposes and objects of the trust, and a violation of the duty of the defendants as trustees, and an abuse of their power and duty. And decreed that the trustees named as defendants, and those who had been, during the suit, elected trustees by the defendants or those acting with them, be removed ; and a new election was ordered at a time therein named, unless the complainants and those acting with them had elected trustees, in which case those were declared to be trustees.   And it was declared that the complainants and those concurring with them in opposition to such breach of trust, and who statedly worshipped with them, and adhered to the Associate Presbytery of Cambridge, as subordinate to the Associate Synod of North America, were in law and in fact the only members of the congregation known by the corporate name of the " Associate Congregation of Cambridge, &c." to which the said trust property and effects belonged ; and they alone were entitled to vote for trustees. And that the property be delivered up to those already elected or to be elected and so declared trustees.   And that there be an accounting for the use of the property from the 12th of April, 1838, and the amount ascertained to be paid by the defendants, not including the corporation.   And the defendants were enjoined from intermeddling, and perpetually enjoined from appropriating the property except according to the decree, and from preventing those from using it, &c. who were adjudged members, or from a free use and enjoyment of it for the purposes for which it was dedicated, &c.   That the supplemental bill be dismissed, with-

out costs to either party, as against each other, and that the complainants have their costs out of the property of the corporation.

The above is a brief outline of some of the leading facts of this case, which, with those stated in the opinions delivered in this court, are all that are material to understand the points decided, and the views of the court.

*C. L. Allen*, for the appellants.

*S. Stevens* and *M. Fairchild*, for the respondents.

HAND, J. The important questions arising in this case call for a careful consideration. Our civil and religious institutions differ so widely from those of the country whence we derive the common law, that upon some points but little light, comparatively, is received from that source. And in consequence of the diversity of legislation on the subject, very little aid can be obtained from the decisions of the courts of sister states, and the contrariety of opinion in our own courts, unfortunately leave the matter in some perplexity.

These considerations naturally produce doubt and timidity in the judicial examination of a subject so delicate, and so closely connected with the very well-being of society. All the judge can do in such cases is to inquire, with patience and careful research, what is the law of the case ; and that, ascertained, declare it ; minding that the *via trita* is the safest, and avoiding judicial legislation.

The first step in the inquiry is into the nature of the conveyances admitted by the pleadings. Those from French are, perhaps, the most important, because the church edifices were both built upon the premises described therein. The first deed was given in 1786, the year after the church or congregation was organized ; and the first house was built soon after. Gilmore's deed of another parcel was given in 1799. In 1810, French and his wife executed another deed of the same premises described in his deed of 1786. The incorporation took place in 1826. Whatever estate was held by the grantees in

these three deeds, no doubt passed to the corporation upon that event, by force of the fourth section of "an act to provide for the incorporation of religious societies," passed April 5, 1813. The first conveyance by French was for the sole and only proper use, benefit and behoof of this associate congregation ; and was to the grantees and their successors forever, without the word "heirs." Notwithstanding this was before our revised statutes, and the church was incapable of taking and holding real estate, because it had no corporate or legal existence, still it took a beneficial interest, which equity would protect. And the same rule applies to the land described in Gilmore's deed. " A use," says Lord Bacon, "to a person uncertain, is not a void limitation, but executeth not till a person be *in esse.*" (*Bacon Read. on Statute of Uses,* 302, *last Amer. ed.*) It has been held that a devise was good, when not in mortmain, to a corporation to be thereafter created. (*Inglis* v. *Sailor's Snug Harbor,* 3 *Peters,* 114. *Beatty* v. *Kurtz,* 2 *Id.* 566.) And property in some cases may be granted or dedicated to the use of a body incapable of holding in its own right. (*Potter* v. *Chapin,* 6 *Paige,* 649. 2 *Kent,* 286. 4 *Id.* 508. *Burr's Ex'rs* v. *Smith et al.* 7 *Vt. Rep.* 241. *Baptist Church in Hartford* v. *Witherell,* 3 *Paige,* 296. *Vidall* v. *Girard's Executors,* 2 *How. U. S. Rep.* 127. *Dutch Church in Garden-street* v. *Mott,* 7 *Paige,* 77. *Wright et al.* v. *Trustees of the Methodist Episcopal Church,* 1 *Hoff. Ch. Rep.* 202. *Shotwell* v. *Mott,* 2 *Sand. Ch. Rep.* 46. *City of Cincinnati* v. *White,* 6 *Peters,* 435. 9 *Cranch,* 331.) The beneficial interest in property may become, and frequently is, vested in objects as *cestuis que trust* whose existence is not recognized at law ; and of course it may be held for the benefit of many objects, as *cestuis que trust,* whose separate existence as the recipients of property is not recognized or admitted by the common law. (*Hill on Trustees,* 52, 53, *Am. ed. et supra.*) If the deed given by French in 1810 had been valid as a conveyance, perhaps a question would have arisen whether the property conveyed thereby passed to the corporation, under the special trust contained therein, though it seems to me quite clear that it would.

Robertson *v.* Bullions.

If not, it would have remained in the trustees, in the deed, or the survivors or survivor, or his heirs, as the case may be ; and notwithstanding the allegations in the bill and the admissions in the answer in relation to these trusts, the case would be defective for want of parties. But the deed of French given in 1810 is entirely ineffectual, either as a conveyance or declaration of trust. In 1786 he conveyed away all his interest in the same lands to seven persons as trustees. Soon after, a house of worship was erected thereon. The trusts declared in that deed were valid, and consequently the *cestuis que trust* took a beneficial interest thereby, which it was not competent for the grantor, unless he had reserved that right in the first deed, as was done in the Hewley case, even with the consent of all the trustees, to revoke or change. Much less did an attempted conveyance to three of the seven original trustees, together with eleven others, and to their heirs forever, and to the use of different *cestuis que trust*, and after the lapse of 24 years and the erection of a place of worship by the first *cestuis que trust*, divest the latter or any of them of their rights. French had nothing to convey ; those having the legal estate had no power to yield or alter it. Even if, strictly, only a life estate passed at law, equity, beyond all question, under the circumstances, would have secured this property to the society. ( *Vidall* v. *Girard's Ex'rs, supra ; and see Baptist Church of Hartford* v. *Witherell, supra, and* 9 *Cowen,* 437.) The entire deed is not shown to us; but it is probable the covenant for further assurance, also provided for this, had it been necessary. Besides, it is not shown whether the grantees in the first deed were dead when the society was incorporated ; nor even at the time the bill was filed. Nor does the second deed purport to be a release or conveyance of the remainder, but rather a confirmation of the first. It is true, the first deed was to certain persons described as trustees of this congregation, and their " successors forever ;" while the deed of 1810 was to certain persons also named as trustees of said congregation, " their heirs and assigns," and in the *habendum* clause " to their heirs and assigns forever." But the last deed recites that

Robertson v. Bullions.

its object was to confirm the title, not only in those who were in full communion and who should compose the congregation, but to those they had chosen or might choose for trustees, and their successors in office forever. The first deed is full as strong in relation to the succession, and contains a covenant for further assurance to the persons named as trustees, and their successors, for the sole use of the said associate congregation. This covenant could not be performed by a further conveyance to other quarters, for the benefit of new parties. But the first deed, without the word " heirs," would undoubtedly convey the property in trust to the grantees named therein, so as to pass the legal title to the corporation when that should come into existence. By a devise to a man and his successors, the fee vests without the word heirs. (2 *Jar. on Wills*, 180. 8 *Vin. Ab.* 209.) And though in a deed to a natural person, the words " successors forever" would not pass the fee here, before our revised statutes, they would to a corporation. (*Co. Litt.* 8 *b.* 4 *Cruise*, 442.) So that the proper words to vest the fee in the corporation, when the society should become incorporated, were used in this deed. A corporation, it was held, took the legal title when the lands had been previously conveyed to " the elder or minister, deacons, wardens or vestrymen, and their successors in office of the First Baptist Church in Hartford." (*Baptist Church in Hartford* v. *Witherell,* 3 *Paige,* 296.) A different construction would be most unreasonable, where the scope and object of the conveyance were perpetual, and the society had expended so much upon the property. (3 *Peters,* 147.) This view of the case, renders it unnecessary to decide what would have been the nature and effect of that instrument had it been valid.

The deeds from Dr. Bullions in 1827, and from Mr. Stevenson in 1835, passed the property therein described, directly to the corporation. For, although the conveyances are to certain persons by name, as trustees, and not to the corporation by its corporate name, there is sufficient appearing upon the face of the instruments to designate the real grantee, and show the intention of the parties ; and besides that, having capacity to take the legal estate, the use, I think, would be executed at

Robertson *v.* Bullions.

once in the corporation. It is not necessary to inquire there-
fore whether a conveyance in trust for a religious corporation is
now good. (*McCartee* v. *Orphan Asylum Society*, 9 *Cowen*,
437. *Theo. Sem. of Auburn* v. *Childs*, 4 *Paige*, 423. *Shot-
well* v. *Mott*, 2 *Sand. Ch. Rep.* 51. 1 *R. S.* 728, 9, §§ 49, 58;
737, § 129. 2 *Id.* 57, § 3.)

To a proper understanding of the law applicable to this
case, it is necessary to ascertain the character and qualities of
these religious corporations.

The first general act in this state upon this subject was
that of 1784. (1 *Greenl. Laws*, 71.) The provisions of that
act affecting denominations not otherwise therein particularly
specified, were substantially the same as the law passed March
27th, 1801, (1 *K. & R.* 336,) of which the material parts of
our present law, " an act to provide for the incorporation of re-
ligious societies," passed April 5th, 1813, are a transcript. The
first section of the latter is applicable to the Protestant Episco-
pal Church, and does not affect this case. But it may be re-
marked that the electors of church wardens and vestrymen are
confined by that section to the " church or congregation," omit-
ting the word " society ;" and the church wardens and vestry-
men elected, together with the rector, if there be one, form a
vestry and are the trustees ; and as such, are a body corporate.
And the church wardens and vestrymen have power " to call
and induct a rector to the church or congregation," as often as
there is a vacancy. The second section is applied to the Re-
formed Protestant Dutch Church or congregation, and makes
the minister, elders and deacons, or if no minister, then the
two latter, " elected according to the rules and usages of such
churches within this state," trustees of such " church or congre-
gation ;" and such trustees are authorized to become incor-
porated by filing a proper certificate.

The third section applies to all other churches, congrega-
tions or religious societies, except a few special cases, found in
this and subsequent statutes. It enacts, " That it shall be law-
ful for the male persons of full age, belonging to any other
church, congregation, or religious society, now or hereafter to

be established in this state, and not already incorporated, to assemble at the church, meeting house, or other place where they statedly attend for divine worship, and by plurality of voices, to elect any number of discreet persons of their church, congregation or society, not less than three nor exceeding nine in number, as trustees, to take the charge of the estate and property belonging thereto, and to transact all affairs relative to the temporalities thereof; and that at such election every male person of full age, who has statedly worshipped with such church, congregation or society, and has formerly been considered as belonging thereto, shall be entitled to vote; and the said election shall be conducted as follows : the minister of such church, congregation or society, or in case of his death or absence, one of the elders or deacons, church wardens or vestrymen thereof, and for want of such officers, any other person being a member or a stated hearer in such church, congregation or society, shall publicly notify the congregation of the time when, and place where, the said election shall be held, at least fifteen days before the day of election ; that the said notification shall be given for two successive sabbaths, or days on which said church, congregation or society, shall statedly meet for public worship, preceding the day of election ; that on the day of said election, two of the elders or church wardens, and if there be no such officers, then two of the members of the said church, congregation or society, to be nominated by a majority of the members present, shall preside at such election, receive the votes of the electors, be the judges of the qualifications of such electors, and the officers to return the names of the persons who by plurality of voices shall be elected to serve as trustees for the said church, congregation or society, and the said returning officers shall immediately thereafter certify under their hands and seals the names of the persons elected to serve as trustees for such church, congregation or society, in which certificate the name or title by which the said trustees and their successors shall forever thereafter be called and known, shall be particularly mentioned and described ; which said certificate being proved or acknowledged as above directed shall

be recorded as aforesaid ; and such trustees and their successors shall also thereupon by virtue of this act be a body corporate by the name or title expressed in such certificate."

The fourth section applies to the trustees of all the churches, congregations, and societies embraced within the first, second, and third sections. It requires them to have a common seal, and empowers them " to take into their possession and custody all the temporalities belonging to such church, congregation or society, whether the same consist of personal or real estate, and whether the same shall have been given, granted, or devised directly to such church, congregation or society, or to any other person for their use, and also by their corporate name or title to sue and be sued in all courts of law or equity, and to recover, hold, and enjoy all the debts, demands, rights and privileges, and all churches, meeting houses, parsonages and burying places with the appurtenances, and all estates belonging to such church, congregation or society, in whatsoever manner the same may have been acquired, or in whose name soever the same may be held, as fully and amply as if the right or title thereto had originally been vested in said trustees ; and also to purchase and hold other real and personal estate, and to demise, lease, and improve the same for the use of such church, congregation or society, or other pious uses," not exceeding a certain amount. "And also to repair and alter their churches or meeting houses, and to erect others if necessary, and to erect dwelling houses for the use of their ministers, and school houses and other buildings for the use of such church, congregation or society ; and such trustees shall also have power to make rules and orders for managing the temporal affairs of such church, congregation or society, and to dispose of all moneys belonging thereto, and regulate and order the renting of the pews in their churches and meeting houses, and the perquisites for the breaking of the ground in the cemetery or churchyards and in the said churches and meeting houses for burying the dead, and all other matters relating to the temporal concerns and revenues of such church, congregation or society," and appoint a clerk, treasurer, and collector, &c.

Section fifth declares the number of trustees necessary to do

business. By section sixth, they continue in office three years and are divided into three classes; the term of office of one expiring every year; and that section provides for filling vacancies by expiration of office, death, &c.

The seventh section declares, " That no person belonging to any church, congregation, or society, intended by the third section of this act, shall be entitled to vote at any election succeeding the first, until he shall have been a stated attendant on divine worship in the said church, congregation or society, at least one year before such election, and shall have contributed to the support of the said church, congregation or society, according to the usages and customs thereof; and that the clerk to the said trustees shall keep a register of the names of all such persons as shall desire to become stated hearers in the said church, congregation or society, and shall therein note the time when such request was made; and the said clerk shall attend all such subsequent elections, in order to test the qualifications of such electors, in case the same should be questioned."

The eighth section reads as follows: " And be it enacted, that nothing in this act contained shall be construed or taken to give to any trustee of any church, congregation or society, the power to fix or ascertain any salary to be paid to any minister thereof, but the same shall be ascertained by a majority of persons entitled to elect trustees, at a meeting to be called for that purpose; and such salaries, when fixed, shall be ratified by the said trustees, or a majority of them, by an instrument in writing under their common seal, which salary shall thereupon be paid by the said trustees out of the revenues of such church, congregation, or society."

The ninth section allows any " religious corporation" (other than those chartered) when deemed necessary, and for the interest of such " religious corporation, to reduce their number of trustees," but not to less " than three trustees in any one of the said religious corporations."

Sections ten, twelve and fifteen relate to the amount of yearly revenues, and also to the report thereof to the chancellor or a justice of the supreme court, or a county judge by the churches

in New-York, Albany and Schenectady; and provides that in case of an excess that officer is to report the same to the legislature.

Section eleven empowers the chancellor, on the application of the corporation, to authorize the sale of its real estate, (not granted by the state, &c.) and direct the application of the avails by the corporation " to such uses as the same corporation with the consent and approbation of the chancellor shall conceive to be most for the interest of the society to which the real estate so sold did belong."

Section thirteen, (no doubt referring to the former statutes,) establishes and confirms " every corporation of any church, congregation or religious society," made in pursuance of any law of this state in conformity to the directions of this act; and in case of a dissolution by reason of non-compliance with the statutory regulations, provides for re-incorporation within six years.

Section fourteen applies solely to the Methodist Episcopal Church in the city of New-York.

The sixteenth section provides, " that whenever any religious corporation shall be dissolved by means of any nonuser or neglect to exercise any of the powers necessary for its preservation, it shall be lawful for the religious society which was connected with such corporation to re-incorporate itself in the mode prescribed by this act, and that thereupon all the real and personal property which did belong to such dissolved corporation at the time of its dissolution shall vest in such new corporation for the said society."

The law of 1826, (ch. 47,) amendatory of this act, provides for holding over in case of omission to elect, and authorizes a re-election to fill vacancies. And the second section declares that in case of an omission of any church, congregation or religious society to elect trustees, church-wardens, vestrymen or other officers, such church, congregation or religious society shall not be deemed or taken to have been thereby dissolved, but those officers shall hold over, provided a new election shall take place within one year. And the third section of the amendatory act of 1844, (ch. 158,) is a repetition of this section.

The statute from which we have so largely extracted, is no doubt valid; and corporations could be created under it before the recent revision of our constitution, notwithstanding the "two-thirds" clause in the constitution of 1821. (*Art.* 7, § 9.) It was a statute then existing. (*Id.* § 13.) And besides, if passed since, would clearly be good upon the same grounds that sustained the general banking law. (*See Gifford* v. *Livingston,* 2, *Denio,* 382.)

Then what kind of corporations are they ?

The answer to this inquiry may be of some importance in this case. Chancellor Kent, in his commentaries, denominates them "ecclesiastical corporations," and Angel & Ames in their valuable work on corporations, upon this authority, adopt the same application. (2 *Kent,* 274. *Ang. & Ames on Corp.* 33.) Neither cites any decision. Considering the high authority from whence the remark emanates, I express a dissent with much timidity, but with deference, I think it incorrect. I doubt whether, in a technical sense, there are any ecclesiastical corporations in this state, particularly under the third section of this act. As an ecclesiastical body, they have no legal existence; they have no ecclesiastical power. They are not controlled by and can not control the church, or any church judicatory, or interfere in spiritual concerns. Their object and purpose is to manage the temporalities of the society. "Ecclesiastical corporations," says Blackstone, "are where the members who compose it, are entirely spiritual persons; such as bishops, certain deans and prebendaries; all arch-deans, parsons and vicars, which are sole corporations; deans and chapters at present, and formerly prior and convent, abbots and monks, and the like; bodies aggregate." And in describing the class of lay corporations known as eleemosynary, he adds: "and all these eleemosynary corporations are, strictly speaking, lay and not ecclesiastical, even though composed of ecclesiastical persons, and although they in some things partake of the nature, privileges and restrictions of ecclesiastical bodies." (1 *Bl.* 470. *And see Phillips* v. *Bury,* 1 *Ld. Ray.* 6; *Cawdreys case,* 5 *Co. fol.* 15; 2 *Bac. Abr.* 2; 1 *Kyd,* 22.) It is not the profession of piety

by the individuals that renders the corporation of which they are the members, ecclesiastical. The corporation must be *spiritual* in a legal and not in a popular or scriptural sense. Lay corporations may be for the advancement of religion, and the members may all be clergymen, even, but that does not make the corporation ecclesiastical. The king is said, in *Cawdrey's case,* to be "vicar of the highest of kings," and he is a corporation, but I believe he is not considered an ecclesiastical corporation. And if he were, it would be because he is the head of the church, an ecclesiastical body in law. Dartmouth College is a lay and not an ecclesiastical corporation, and would be if the individual members were all ecclesiastical persons. (*Dartmouth College* v. *Woodward,* 4 *Wheat.* 518. *See the opinion of Mr. J. Story. Ang. & Ames,* 34.) And one distinctive feature of ecclesiastical corporations is, that they are subject to the jurisdiction of the ecclesiastical courts or the visitatorial power of the ordinary. (1 *Bl.* 471, *n.* 1. *Tom. Dic.* 436. 1 *Kyd,* 22. *Holt, C. J.* 1 *Show.* 252.) Our religious corporations have no such amenabilities. There the ordinary is the visitor of ecclesiastical corporations, and from him there is an appeal. The king, as the "supreme ordinary," visits the metropolitan, and the metropolitan the bishop. Church wardens (in England) are said to be lay corporations, although instituted for the benefit and advancement of religion and to suppress profaneness and immorality, and to see that public worship be performed with due decency and reverence; and are elected by the parish or the minister and parish. (1 *Bac. Abr.* 597. *Dawson* v. *Fowle, Hardr.* 378. *Holt, C. J. in Rex* v. *Rees,* 12 *Mod.* 116. *Toml. Dic.* " *Church wardens,*" 1 *Lill. Abr.* " *Church wardens.*" 1 *Burn's Eccl. L.* 378.) It may be added, that our corporations have power to build school houses, and dwellings for the minister, and other buildings, &c. If these were ecclesiastical corporations, there would be no visitor, for the reason that no person or officer, with us, has any such jurisdiction. That system is a part of the ecclesiastical polity of England, and does not apply to our religious corporations. (2 *Kent,* 304.)

If lay corporations, then they are either eleemosynary or civil.

If the former, the visitatorial power is with the founders or their heirs ; unless it has been delegated by them to some other person. If a civil corporation, they are not subject to this species of visitation at all. (2 *Kent*, 304.) Perhaps for the purpose of ascertaining the power of a court of chancery in this case, it is not important to decide whether they are eleemosynary or civil ; for that court has no visitatorial power over a private eleemosynary corporation. Where there is a failure or want of a visitor, in such cases, in England, the crown becomes the visitor, and that power is exercised by the court of king's bench, if not a charity, (*Rex* v. *Gregory*, 4 *T. R.* 240, 1, *n.*) and if a charity, within the statute of charitable uses, (43 *Eliz. ch.* 4,) by a petition to the great seal, and not by bill or information ; and then the lord chancellor acts in his visitatorial capacity. (*Ex parte Wrangham*, 2 *Ves. jr.* 609. *Att. Gen.* v. *Earl of Clarendon*, 17 *Id.* 499. *Same* v. *Dixie*, 13 *Id.* 519. *Same* v. *Smart*, 1 *Ves. sen.* 92. *In re Bedford Charity*, 2 *Swanst.* 524. *Dann ex parte*, 9 *Ves.* 547. 3 *Atk.* 109. 1 *Jac.* 1. *Hill on Trustees*, 460.) His jurisdiction over charities, it is said, is a personal authority of the chancellor, and not within the ordinary powers of equity. (*Corp. of Bedford* v. *Lenthall*, 2 *Atk.* 553.) I am aware of the conflict of opinion in the English courts as to the extent of the jurisdiction of the king's bench in cases of private eleemosynary foundations. (*King* v. *Cath. Hall*, 4 *T. R.* 233. *Eden* v. *Footer*, 2 *P. Wms.* 326. 12 *Mod.* 116. *F. N. B.* 42. *King* v. *Bishop of Chester*, 2 *Str.* 797. *Rex* v. *Gregory*, 4 *T. R.* 240, 1, *n. Green* v. *Rutherford*, 1 *Ves. sen.* 471. *King* v. *Bishop of Ely*, 2 *T. R.* 339. *Ex parte Wrangham, supra.*) Visitatorial power, perhaps, is not now professional language, when speaking of the law courts ; but the king's bench has a superintendent authority where other jurisdictions are deficient. And at all events, the power where it exists on the other side of the courts, belongs to the great seal and not to chancery as a court of equity jurisdiction, except on the ground of trust.

But I am inclined to the opinion that these corporations are not eleemosynary, although occasionally so called. Eleemosynary corporations " are constituted for the perpetual distribution

of the free alms or bounty of the founder of them, to such persons as he has directed ;" (1 *Bl.* 471 ;) and are of two general descriptions; hospitals for the maintenance and relief of poor and impotent persons, and colleges for the promotion of learning, and the support of persons engaged in literary pursuits. Blackstone says, that the universities of Cambridge and Oxford are not eleemosynary corporations, "though stipends are annexed to particular magistrates and professors, any more than other corporations where the acting officers have standing salaries, for these are rewards *pro opere et labore,* not charitable donations only, since every stipend is preceded by service and duty." No writer upon elementary law, uses the term in a different sense than that given by Blackstone, which also accords with its etymology. (2 *Kent,* 274. 1 *Wooddes.* § 474. 1 *Kyd on Corp.* 25. *Phillips* v. *Bury,* 1 *Ld. Ray.* 5 ; *S. C.* 2 *T. R.* 346 ; *S. C. Holt,* 724. *Webst. Dic. tit. Eleemosynary. Babb* v. *Reed,* 5 *Rawle,* 151.) Those institutions are considered of this kind, where the plan is one of bounty, charity, and benevolence to others; not those which are for the use of, and beneficial and make return to the donors. Even a school, unless it be a free school, does not come within the statute of charitable uses, 43 *Eliz.* (*Att'y Gen.* v. *Hewer,* 2 *Vern.* 387.) In this very case, the land was purchased and paid for by, and conveyed to the society for their own use, and the attorney general is not a necessary party. Religious societies may be the means of dispensing the richest bounties, but the beneficiaries are, in a great measure, the founders themselves.

If, then, these corporations are not ecclesiastical, nor eleemosynary, they fall into the remaining class, private and civil. I think they possess the nature and qualifications of private, civil corporations, created mainly for the purpose of aiding in the promotion and enjoyment of religion, by managing the property of the church. Civil corporations are subject to no visitation, except in England by the king, who exercises this power in the king's bench, which is his representative, by mandamus, or quo warranto ; and here this power, in a degree, belongs to the government, and was exercised in our supreme court; which is

the representative, in our judicial system, of the king's bench; and in the same manner, if such power did formerly exist here at all, as the king's bench superintends the civil corporations of the kingdom. (3 *Bl.* 42. 2 *Kyd on Corp.* 174. 2 *Kent*, 304. *Ordinance of* 1704, *establishing our Supreme Court.* 2 *R. L. App.* 6.) Our statutes now give certain powers over corporations to the supreme court and the court of chancery; but religious corporations are expressly excepted from their operation. (1 *R. S.* 603 § 5; 605, § 11. 2 *R. S.* 462, §§ 33, 35; 466, § 57.) So the law, as to these, remains as before. The king in England, and the legislature here, as founders in a certain sense of all civil corporations, are said to have visitatorial capacity; and they are visited and inspected, where no statute interposes, in the court of king's bench according to the rules of common law, and not elsewhere or by other authority. (1 *Bl.* 481. *Att'y Gen.* v. *Utica Ins. Co.* 2 *John. Ch. Rep.* 371. *Auburn Academy* v. *Strong*, *Hopk. R.* 278. 2 *Kent*, 300.) But whether ecclesiastical, eleemosynary or civil, our court of chancery has no jurisdiction as visitor over these religious corporations.

"This court," said Sir William Grant, master of the rolls, "I apprehend, has no jurisdiction with regard either to the election or amotion of corporators of any description." (*Attorney Gen.* v. *Earl of Clarendon*, 17 *Ves.* 499.) And Lord Eldon, in a case of gross abuse of a charity under the statute of 43 of Eliz. upon an information, stopped the cause until a petition was presented to him in his visitatorial capacity, and then declared an election invalid. (*Att'y Gen.* v. *Dixie*, 13 *Ves.* 519.) The same view was taken by Lord Commissioner Eyre. "If the governors," said he, "established for the regulation of it [a charity established by charter,] are not those who have the management of the revenues, this court has no jurisdiction; and if ever so much abused, as far as respects the jurisdiction of this court, it is without remedy; but if those established as governors have also the management of the revenues, this court does assume a jurisdiction of necessity, so far as they are to be considered trustees of the revenue." (*The Att'y Gen.* v. *Gov. of the Found. Hosp.* 2 *Ves. jun.* 47.) Chancellor Kent, on a review of the cases,

came to the same conclusion. (*The Att'y Gen.* v. *The Utica Ins. Co.* 2 *John. Ch.* 371. And see 2 *Kent,* 303, 4; 2 *Bac. Ab.* 27; *Dartmouth College* v. *Woodward, per Story, J.* 4 *Wheat.* 518; *Ang. & Ames on Corp.* 407.) The power of amotion or disfranchisement of a member for reasonable cause, is incident to every corporation, (2 *Kent,* 299,) and, notwithstanding it was said in *Bagg's case,* (11 *Co.* 99 *a,*) where Lord Coke puts it on the 29th chapter of magna charta, *nullus liber homo capiatur,* &c. giving it rather a literal reading, that this could be done only where the authority is given by the express words of the charter, or by prescription; or where the member has been convicted by course of law; the power is now well established by a series of decisions. In *The King* v *Richardson,* (1 *Burr.* 517,) Lord Mansfield expressly recognized the power, and disregarded the *dictum* in *Bagg's case.* (And see *Rex* v. *Tidderly,* 1 *Sid.* 14, cor. Ld. Holt; *King* v. *Mayor of Lyme Regis,* 1 *Doug.* 149; *Comm.* v. *St. Pat. Benev. Society,* 2 *Binney,* 448; *Innes* v. *Wylie,* 1 *Carr. & Kirw.* 257; *Ang. & Ames on Corp.* 33, 404 to 415; 2 *Bac. Abr.* 21, 23.) In the case in Binney, Ch. J. Tilghman defines what is a reasonable cause for disfranchisement; and in *The Commonwealth* v. *Guardians of the Poor,* it was held that mere misemployment of the corporate funds was not sufficient. (6 *S. & R.* 469.) There must be reasonable cause; and then the rule does not extend to the disfranchisement of a member, so as to deprive him of his stock by the act of the corporators in a joint stock or moneyed corporation, unless there is express authority for that purpose; in which case, no doubt, the reasoning in Bagg's case would apply. Though a removal of a corporator from office is a different thing. (2 *Kent,* 298.) No reference is here made to the statute, restricting the exercise of corporate powers, &c.; for religious corporations are excepted. (1 *R. S.* 600, § 3; 605, § 11.) Our statute now gives to the "chancellor," among other things, power " to suspend any trustee or officer" of a corporation "from exercising his office whenever it shall appear that he has abused his trust;" and " to remove any such trustee or officer from his office, upon proof or conviction of gross misconduct; to direct

new elections to be held by the body or board duly authorized for that purpose, to supply vacancies created by such removal ;" and if there be no such body, then to report that fact to the governor, who may fill the vacancies with the consent of the senate. (2 *R. S.* 462, § 3.) And this jurisdiction " shall be exercised as in ordinary cases on bill or petition, as the case may require or the chancellor direct, at the instance of the attorney general prosecuting in behalf of the people of this state, or at the instance of a creditor of such corporation, or at the instance of any director, trustee or other officer of such corporation having general superintendence of its concerns." But the same article also declares that these provisions shall not extend to any religious corporation.   (2 *R. S.* 466, § 57.)   And the statute seems to imply that no such power existed at common law ; and there is also an implied prohibition against, or denial of, any such jurisdiction over religious corporations, and consequently, they are left to the law applicable to corporations generally.   " Where a corporation is duly created, all other incidents are *tacite* annexed."   (*Sutton's Hospital case,* 10 *Co.* 31.)

It follows, that chancery has no power to disfranchise a member, or remove one of the officers of a corporation, in this state, only so far as that power is given by statute.   Disfranchisement, it is said, is properly predicable of a member and amotion of an officer of a corporation.   (*Ang. & Ames on Corp.* 404.)   But neither, in case of a private civil corporation, at common law, is within the power of that court.

But there is another important inquiry ; where the incorporation is under the third section of the act, who are the corporators ?   This is not without difficulty.   Chancellor Walworth, in *Lawyer* v. *Cipperly*, says that the statute of 1784 recognized three distinct classes or bodies existing in a religious corporation ; " the church or spiritual body, consisting of the office-bearers and communicants ; the congregation or electors, embracing all the stated hearers or attendants on divine worship who are competent to vote for trustees ; and the trustees of the corporation." (7 *Paige*, 285.   *See* 16 *Mass.* 503, 4 ; 10 *Pick.* 193 ; 11 *Id.* 494.)   But the 11th section of that act is not found in the acts

of 1801 and 1813. That section declared that nothing in the act should be construed or adjudged to abridge or affect the rights of conscience or private judgment, or to change the religious constitution or government of the church, congregation or society, so far as respected or in any wise concerned the doctrine, discipline or worship thereof. This statute, and both of the others, were passed during the existence of the constitution of 1777, so that the change is not attributable to any alteration in the organic law. And the clause proclaiming religious freedom is retained in both of the subsequent revisions of the constitution. (*Const. of* 1777, *art* 38. *Const. of* 1821, *art.* 7, § 3. *Const. of* 1846, *art.* 1, § 3.) The 11th section of the act of 1784, was not therefore important to secure religious liberty; the constitution guaranteeing that in the broadest terms. If by the omission of that section the implication arises that the converse proposition obtains, taht is, that an incorporation under the act may change the religious constitution or government of the church, congregation or society, so far as respected or in any wise concerned the doctrine, discipline or worship thereof, the alteration may be important. But I notice this for the present, only in reference to the present inquiry, who are the corporators? The omission rather weakens the position that the law considers the church an integral part of the corporation. The chancellor adds in *The Baptist Church in Hartford* v. *Witherell*, that *although* a church or body of professing Christians is almost uniformly connected with such a society or congregation, the members of the church have no other or greater rights than any other members of the society, who stately attend with them for the purposes of divine worship. (3 *Paige*, 301.) If it be one of the integral parts of the corporation, and the church should become extinct, the corporation would be dissolved. That was so settled in the well considered case of *King* v. *Passmore*, (3 *T. R.* 199.) This would be so clearly, unless the corporators have power to restore the church. A neglect to elect trustees is provided for by the statute; and is, perhaps, more properly a suspension. (*Phillips* v. *Wickham*, 1 *Paige*, 590. *And see Ang. & Ames on Corp.* 464, 734, 5.) The language

of the third section is, that it shall be lawful for the " male persons belonging to any other church, congregation or religious society," to choose the trustees. The whole statute has reference to religious associations. A " church" (ecclesia) may be—1st. A temple or building consecrated to the honor of God and religion ; or 2d. An assembly of persons united by the profession of the same Christian faith, met together for religious worship. (*Jac. Law Dict.* " *Church.*" *Toml. Dic.* " *Church.*" 5 *Petersd. Abr.* 409. *Town of Pawlet* v. *Clark,* 9 *Cranch,* 292.) These give the legal, though the word has various popular definitions. ( *Webster's Dict.* " *Church.*") In our statute, I think it is used in the sense of the second definition above. " Congregation" has perhaps no settled legal signification. The pleadings in this case state and admit, that in the Associate Church it is used to designate a local church ; and it would seem that the word " church" with them implies the church of that denomination in its aggregate capacity, the same as the term, " Church of England," which is not a corporation. (*Town of Pawlet* v. *Clark,* 9 *Cranch,* 292, *Story, J.* *Comm.* v. *Green,* 4 *Whart.* 531.) The word " congregation" occurs frequently in the books made exhibits in this suit. (See the Ordination Vows, in the book containing the Narrative and the Declaration and Testimony, 174 et seq. ; the Form of Church Government, " Of Particular Congregations," p. 572 ; Perdivan, b. 1, tit.1, and indeed throughout ; 2 Gib's Display, 76 ; and Church Government, art. 3.) " Congregation" was an appellation given to the protestants in Scotland in 1559, from their union. (*Robertson's History of Scotland, b.* 2.) The term is used in the penal laws of England against disturbing public worship ; particularly those to protect the worship of protestant dissenters. (1 *W. & M. ch.* 18.) But, as used in this statute, a congregation, I take it, is an assembly met, or a body of persons who usually meet in some stated place for the worship of God and religious instruction ; and may or may not include a church or spiritual body. And the same may be said of the term " religious society," used in the same connection in the third section. The church, congregation or society must, to organize, have stated " divine wor-

Robertson *v.* Bullions.

ship;" for the electors must have attended the same to constitute them such by the third and seventh sections. Whether religion and *divine worship* in their broadest sense, or Christian sects only, are intended, it is not necessary now to inquire. The statute declares that the persons chosen trustees shall be a body corporate. Most of our statutes, in similar cases, use different expressions ; as in the acts for the incorporation of literary, manufacturing and medical societies, cities and villages, &c. And the 13th and 16th sections speak of the corporation being dissolved, (not suspended,) and authorizes the "religious society which was connected therewith" to reincorporate. But the 9th section permits a religious corporation to reduce the number of trustees, and the congregation or society, I think, is there intended. The 11th section speaks of the "society, to which the real estate so sold did belong ;" and the act of 1826 declares that if there be an omission to elect trustees, the church, congregation or religious society shall not be deemed thereby to have been dissolved. Several ambiguous expressions of this nature are found in the statute. Upon the whole, I am inclined to think, all of the electors are corporators. They elect the trustees and from their own body, and these are the officers of the society. It is true, a right of election is often vested in others beside the corporators. This is almost invariably so with sole corporations. Churchwardens, who are a corporation for certain purposes, are elected by the parish, or by the minister and parish. But several opinions concur in the position, that the electors are corporators. Those of Chancellor Walworth in the *Baptist Church* v. *Witherell,* and *Lawyer* v. *Cipperly, (supra,)* have been stated. A. V. Ch. Sandford seems to have entertained the same opinion. (*Cammeyer* v. *United German Lutheran Churches,* 2 *Sandf. Ch.* 186.) And so I infer did Gardiner, president, in *Miller* v. *Gable,* in the court for the correction of errors, (2 *Denio,* 548.) The persons entitled to vote are designated by the statute. At the first election, for the purpose of organizing, they must be male adults, belonging to the church, congregation or society, and must have statedly worshipped with the same, or have formerly been considered as belonging thereto.

Robertson *v.* Bullions.

And after the first election they must have been stated attendants on divine worship in said church, congregation or society, at least one year previous, and have contributed to the support of the church, congregation or society, according to its usages and customs.

The statute, therefore, declares who are the corporators, and the court of chancery can not indirectly disfranchise a member by declaring that he does not possess the necessary qualifications. That power is expressly given to others by the act, and the law courts, in case of controversy, alone can review the matter, if that can be done by any tribunal.

If the foregoing views are correct, then those parts of the decree appealed from in this case, which removed some of the defendants as trustees or officers of the corporation, and which declare that the adherents of Dr. Bullions are not members of the corporation, and who are electors therein, and which provide for a new election of trustees, are erroneous ; the court of chancery having no power of amotion of an officer of these corporations, or to disfranchise a member thereof, or interfere with or control the election of its officers.

But, although a court of chancery has no jurisdiction with regard to the election or amotion of corporators, it may, in some cases, where a corporation is a trustee, take from it the trust fund, if the trust be abused. Even the trustees of a literary or charitable institution in whom visitatorial power is vested by the incorporation, are not placed beyond the reach of the law. As managers of the revenue of the corporation they are subject to the general superintending power of the court of chancery, not as of itself possessing visitatorial power, or a right to control a charity, but as possessing a general jurisdiction in all cases of an abuse of trust, to redress grievances and suppress frauds. And where a corporation is a mere trustee of a charity, a court of equity will go yet farther, and though it can not appoint or remove a corporator, it will in case of gross fraud or abuse of trust, take away the trust from the corporation and vest it in other hands. (*Story, J. in Dartmouth College* v. *Woodward,* 4 *Wheat.* 528. *Mayor of Coventry* v. *Att'y Gen.*

VOL. IX.    13

7 *Bro. Parl. Ca.* 235. *Att'y Gen.* v. *Gov'rs of Foundling Hosp.* 2 *Ves. jr.* 42. *Ex parte Greenhouse,* 1 *Mad. R.* 109. *Ex parte Kirby Ravensworth Hospital,* 15 *Ves.* 314. *Att'y Gen.* v. *Earl of Clarendon,* 17 *Id.* 499. *Greene* v. *Rutherforth,* 1 *Ves. sen.* 468. *Dummer* v. *The Corporation of Chippenham,* 14 *Ves.* 252. *Mayor of Colchester* v. *Lawton,* 1 *V. & B.* 246. *Verplank* v. *Mer. Ins. Co.* 1 *Edw. Ch. Rep.* 84. *Att'y Gen.* v. *Utica Ins. Co.* 2 *John. Ch. Rep.* 371, 389. *Lewin on Trusts and Trustees,* 393, 394. *Att'y. Gen.* v. *Mayor of Newbury,* 3 *M. & K.* 647. *Angell and Ames on Corporations,* 304, 407.)

Chancery had jurisdiction over trustees for certain purposes, it seems, even before the statute of uses, 27 Hen. 8, c. 10; and at all events before the statute of charitable uses, 43 Eliz. c. 4. (1 *Spence's Eq. Jur. of Chan'y,* 458, 466. 4 *Viner's Ab.* 386. *And see note to Vidall* v. *Girard's Ex'rs,* 2 *How. U. S. Rep.* 155. 2 *Fonb.* 207 *and notes to the Am. ed. Angell & Ames on Corporations,* 143.) Independent of its special jurisdiction by the statute of 43 Eliz., chancery, by virtue of its general jurisdiction over trusts, may enforce them when for charitable purposes, in many cases. (2 *Story's Eq. Jur.* § 1187.) The favor formerly shown to donations for charitable uses, induced the court of chancery to disregard the statute of mortmain, and allow corporations to take lands for that purpose by devise. Lands held by a corporation ordinarily revert to the donor on its dissolution, but not so in case of a charity. (*Att'y Gen.* v. *Lord Gower,* 9 *Mod.* 226.) And the language of Lord Chancellor Ellesmere, that the goods in the hands of the administrators were all to charitable uses, and that the office of the ordinary and of the administrator is to employ them in pious uses, and that the kindred and children have no property or pre-eminence but under the title of charity, would not now readily receive our assent. (*Damus' case, Moor,* 822–3.) This was said by him while he and Baron Altham were sitting as commissioners under the statute of Elizabeth.

But this statute of charitable uses has never been re-enacted in this state, and though many principles of equity growing out of

Robertson *v.* Bullions.

that statute, have been adopted here, the visitatorial power
has not followed.   And, indeed, in England, the interposition
of the court, where the charity is founded upon charters, or
by act of parliament, and a visitor, or governor, or trustees
appointed, must be referred to the general jurisdiction of the
court in all cases in which a trust conferred appears to have
been abused ; and not to an original right to direct the man-
agement of the charity, or the conduct of the governors or
trustees.   The king, as *parens patriæ,* has a right to enforce
all charities of a public nature.   (2 *Story's Eq.* §§ 1154 *a,*
1190.   *See Dartmouth College* v. *Woodward,* 4 *Wheat.* 676.
*Att'y. Gen.* v. *Middleton,* 2 *Ves. sen.* 327.   4 *Wheat.* 1.   3 *Pet.
R. app.* 498.   *Coop. Eq. Pl.* 27 ; *and the cases before cited.*)   Of
course the statute of 52 Geo. 3, ch. 101, in relation to charita-
ble uses, has no force here.   The statute of charitable uses
provided for the appointment of commissioners by the chancel-
lor, to inquire after and regulate charities, with right of appeal
to the lord chancellor, with power to alter, diminish, annul, en-
large, &c.   (*See* § 10 *of the Statute.*   4 *Vin. Ab.* 476.)   Money
for the support of a dissenting minister, would no doubt be con-
sidered a charity under that statute.   (1 *Jarm. on Wills,* 193,
*Perkins' ed.   Att'y Gen.* v. *Newcomb,* 14 *Ves.* 1.   *Att'y Gen.*
v. *Fowler.* 15 *Id.* 85.   *Powerscourt* v. *Powerscourt,* 1 *Mol-
loy,* 616.   *Shelford on Mort. and Char. Uses,* 61.   1 *Lill.
Ab.* 375.   *Att'y Gen.* v. *City of London,* 1 *Ves. jr.* 243.   *Att'y
Gen.* v. *Hickman,* 2 *Kel.* 34.)   But no such power is possessed
by our court of chancery as is given by that statute.   (*Baptist
Church* v. *Witherell,* 3 *Paige,* 303.)   And, besides, if there
would otherwise have been, our statute, being in the nature of
a revision of the law upon the subject before us, would render
that statute inapplicable.   (3 *Binney,* 597.   *Converse* v. *Cooley,*
10 *Pick.* 37.)   Indeed we now have statutes embracing almost
the whole subject.   One is " an act authorizing certain trusts,"
passed May 14, 1840, (*Laws of* 1840, *ch.* 318,) with an amend-
ment passed May 26, 1841, (*Id.* 1841, *ch.* 261,) and " an act
for the incorporation of benevolent, charitable, scientific and
missionary societies," passed April 12, 1848, (*Id.* 1848, *ch.* 319,)

and an amendment thereto passed April 7, 1849, (*Id.* 1849, *ch.* 273.)

As we have seen, where the corporation is acting merely as a trustee, and grossly abuses the trust, it can be divested thereof. That was the case of *Ex parte Greenhouse,* (1 *Madd.* 92.) There the surviving trustee conveyed the trust property, a chapel, bells therein, and burying ground, (and other property,) to the bailiffs, burgesses, and commonalty of Ludlow; and the corporation pulled down the chapel, carried the bell to the market place, the pews to another church, repaired a bridge with the materials, and leased the site to one of the corporators for one-fourth of its value, and violated the burial place. The vice chancellor, Sir T. Plummer, very properly removed the corporation as trustee, remarking " It is an enormous breach of trust, and such as could not be expected in a christian country !" Here the corporation was a mere trustee, receiving the legal estate, (and improperly too, as stated by the court,) to fulfil the trust. If the corporation of Ludlow had owned the property in their own right without any trust, and had been the beneficial as well as the legal owners, equity would not and could not have taken it from them. It is on the ground of confidence that equity interferes. No corporator or officer of the corporation was removed in that case. A trust, in which as a corporation they had no interest, was taken from them. Probably now, in this state, they could not have acted as trustees at all. (*In re Howe,* 1 *Paige,* 214. *And see* 4 *Id.* 423.)

In this case the corporation, together with four of the six trustees, and Dr. Bullions, claiming to be and officiating as minister, are made defendants. It is admitted that the legal estate is in the corporation. The officers of the corporation, as individuals, have no more beneficial interest than any other corporators. It was said in *Verplank* v. *The Mer. Ins. Co.* that the relation of *cestui que trust* and trustee does not exist between the corporation and stockholders of an incorporated company. (1 *Edw. Ch. Rep.* 47, *per McCoun, V. C.*) But the vice chancellor farther added, that a relation was created between the stockholders and those directors, who in their char-

acter of trustees, become accountable for any dereliction of duty or violation of the trust reposed in them. And he saw no objection to the exercise of an equity power over such persons, in the same manner as it would be exercised over any other trustees. Now a trustee is a "person in whom some estate, interest or power, in or affecting property of any description is vested for the benefit of another." (*Hill on Trustees*, 41.) In *The People* v. *Runkle*, the congregation are said to be the constituents of the trustees. (9 *John.* 156.) In the case of the *Dutch Church in Garden-street* v. *Mott*, the chancellor speaks of the legislature having power to "transfer the legal title from the naked trustees to the *cestui que trust*, after the latter were incorporated." (7 *Paige*, 82.) In *Gable* v. *Miller*, the chancellor decided that the property of the corporation was held in trust for the support of the worship of God by a church to be in a particular connection; and for teaching certain particular doctrines. (10 *Paige*, 649.) Senator Porter, in the same cause, in delivering an opinion in the court for the correction of errors, in favor of sustaining the decree, considered those members of the church who had remained faithful to their allegiance to the government of the church, as "the rightful members of the church, and the only *cestuis que trust* of the property held for the use of that church." (2 *Denio*, 568.) In *Bowden* v. *McLeod*, Vice Chancellor McCoun thought equity would exercise jurisdiction over the property of religious societies, as being trust property. In that case, by a special act, the minister, elders, and deacons were constituted trustees for life. (1 *Edw. Ch. Rep.* 588. *And see* 16 *Mass.* 495, 505, 510.) By the fourth section of the statute under which religious societies are incorporated, the trustees, as we have seen, take possession of and hold all the estate, whether real or personal, and whether before held directly by the church, congregation or society, or by some other person to their use, and however acquired, or by whomsoever held; and they may purchase and demise, lease, and improve the same for the use of the church, congregation or society, or other pious uses. The section further authorizes them to repair and erect places

of worship, dwelling houses for ministers, and school houses and other buildings for the use of the congregation, church or society ; and make rules and orders for managing the property. (3 *R. S.* 295, § 4, 247, 3*d ed.*) By the strict rules of punctuation, perhaps, the leasing and improving to the use of the church, &c. are confined to lands purchased by the corporation ; but no doubt this clause was intended to include all the corporate property. The legal estate is clearly in the trustees, and they are to manage the same, and regulate and order all matters relating to the temporal concerns and revenues of the church, congregation or society. It is said they hold the property in trust ; and this is so stated in the pleadings. But I think not in the ordinary sense of that expression. They too, individually, are usually *cestuis que trust*, only holding the legal estate while in office, but in the management of it, and in every thing relating to their responsibility, they are upon the same footing with the officers of any incorporated company, and liable for fraud or negligence, or gross mismanagement. Mere trustees are liable for these, but in this case the trustees are, as to the management of the property, more properly officers or agents, and with a broader discretion in some respects than mere trustees. (*Ang. & Ames on Corp.* 306–7.) " Trustees," in the statute, is an official designation, not simply persons enjoying private confidence. Even trustees of the latter kind are not liable for a failure to discharge their duty from mistaking or misunderstanding it. (*Att'y. Gen.* v. *Coopers' Co.* 19 *Ves.* 192. *Same* v. *Caius Coll.* 2 *Keen.* 150. *Hill on Trustees*, 191.) Churchwardens are not liable if they proceed fairly. (*Loyd* v. *Poole*, 3 *Hagg.* 477.) Trustees of a charity are not bound to look with more providence to the affairs of the charity than to their own. (*Lord Eldon in Att'y. Gen.* v. *Dixie*, 13 *Ves.* 519.)

In this case the first deed from French is to seven persons described as trustees of the Associate Church of Cambridge, adhering to the Associate Presbytery of Pennsylvania, *habendum* to the said party of the second part, and their successors forever, to the sole and only proper use, benefit and behoof of the said Associate

Congregation of Cambridge. Gilmore's deed, (1799,) is also to seven persons " trustees of the Associate Congregation of Cambridge aforesaid, and their successors in accession to the principles presently maintained by the Associate Presbytery of Pennsylvania," *habendum* to the said party of the second part, and their successors, for the proper use, benefit and behoof of the said Associate Congregation of Cambridge forever." The deed from Dr. Bullions, one of the defendants, (in 1827, one year after the incorporation,) is to six persons, " trustees of the Associate Congregation of Cambridge, of the county of Washington, and state of New-York, adhering to the principles of the Associate Presbytery of Pennsylvania formerly, now the Associate Synod of North America, of which the Rev. Alexander Bullions is minister ;" "*habendum* to the said parties of the second part, and their successors in office forever." The deed from Stevenson is to five persons, " trustees of the Associate Congregation of Cambridge, in the county of Washington, and state of New-York, and their successors in office, adhering to the principles of the Associate Presbytery of Pennsylvania formerly, now formed into the Associate Synod of North America, of which the Rev. Dr. Bullions is now minister," "*habendum* to the said parties of the second part, their successors in office, heirs and assigns, to their sole and only proper use, benefit and behoof forever in trust." As we have seen, these lands belong to the corporation. And I have come to the conclusion that the description of the grantees, as being trustees of a church in connection with the Associate Presbytery of Pennsylvania, and afterwards with the Associate Synod of North America, or as having Dr. Bullions for a minister, does not amount to a condition or limitation of the estate conveyed. No doubt the grantor to a religious corporation may make a particular connection a condition of the grant. And the corporate or denominational name may indicate the nature of the trust, as to doctrines esteemed fundamental. (*Gardiner, president, in Miller v. Gable*, 2 *Denio*, 548.) But in this case, these clauses in the conveyances are merely descriptive of the grantees, and designating the denomination of the church, and admitting it has

Robertson *v.* Bullions.

connection with such a presbytery or synod at that time.    But no condition or limitation in that respect attaches to the estate. This position I think is sustained by the authorities which I shall notice hereafter.

This brings us to the great question in this cause : are the defendants or any of them, violating the trust reposed in them, or their duty, by adhering to and supporting Dr. Bullions ? For if that is so, although a court of chancery can not remove them and can not divest them of this property, it can compel them to do their duty in relation to it.

Upon this subject the cases are not very satisfactory.    The church establishment of England, from which country we derive the great body of our laws, occupies a large space there ; and has not and never can have any representative here.    Sustained by the strong arm of power from the first christianization of the island, its influence has been constantly felt, not only in ecclesiastical matters, but in those of a secular nature.    For a long period, the chancellors of the kingdom were ecclesiastics, such only, being considered fit keepers of the king's conscience. These, first exercised jurisdiction over trusts.    The most rigid rules for the observance of faith, practice, doctrines and government of the church were enforced.  " The toleration of heresy," says Sir. J. Mackintosh,  " was deemed by men of all persuasions, to be as unreasonable, as it would now be thought to propose the impunity of murder." (*History of England, ch.* 13.)  Nor did this end at the reformation. The great Lord Coke was fierce against witches ; ( 3 *Inst.*  45 ;) and he was overruled by the chief justice, chief baron and two of the judges, who as late as 1611, certified to the king that a heretic could be burnt on conviction before the ordinary.  (12 *Co.* 93, *and see Crabb's History of English Law*, 500.)  Indeed, it is questionable whether the same punishment could not be inflicted for a denial of predestination.  (1 *Hal. Const Hist.* 139, *n.*)  Sir Thomas More personally assisted at the punishment of heretics ; and the immortal Bacon, as attorney general, was present, if he did not superintend the torture by the rack, of an old clergyman. Even the Bohemians admitted in general, that corruptors of re-

ligion, and heretics ought to be subjected to capital punish-
ments. (2 *Murdock's Mosheim,* 459, *2d Am. ed.*) And it seems,
until the present century, excommunication disfranchised the
subject; preventing him from serving on a jury, being a witness,
or bringing a suit, and subjecting him to imprisonment. (3
*Bl.* 102.) And even now, by 53 Geo. 3, ch. 127, he is liable to
imprisonment. For some acts, he was *ipso facto* excommuni-
cated. (*Dyer,* 275.) Cut off from grace by statute! True, if
the ecclesiastical court proceeded without authority, chancery
might cause him to be absolved. (16 *Ves.* 346. 12 *Co.* 65.)
"If a man be excommunicated, a prohibition shall assoil him."
(*Holt, C. J.* 12 *Mod.* 311.) And this too, when as early as the
12th century, by the Constitutions of Clarendon, the clergy were
made amenable to the common law courts; and it is laid down
as law, that the ecclesiastical judge should only "correct the
sin." (4 *Inst.* 492. 2 *Bac. Ab.* 171.) One of the causes of the
bitter persecutions of the Hussites, was their demand that the
clergy should have no temporal jurisdiction. (1 *Rapin's Hist.
of Eng. b.* 14, "*State of the church.*") And even in this coun-
try, the same intolerant spirit prevailed, to some extent. The
unfortunate persecutions in the colony of Massachusetts are fa-
miliar to the reader of American history; and in Virginia so
late as 1745, governor Gooch is said to have closed his charge
to the grand jury of the general court, in relation to the Presby-
terians, in this strong language : "In short, we should deviate
from the pious path we profess to tread in, and should be un-
just to God, to our king, to our country, to ourselves, and to our
posterity, not to take cognizance of so great wickedness, whereby
the grace of our Lord Jesus Christ is turned into lasciviousness."
But different views began to prevail. Indeed, from the begin-
ning, there were some bright examples of religious toleration in
the colonies. And Christian statesmen and philanthropists be-
gan to take a broader view of the rights of conscience. "Free-
dom of thought," said Ld. Auckland, about eighty years since,
in his chapter "of crimes relative to religion," "is the preroga-
tive of the human mind." (*Eden's Penal Law,* 91.) It be-
gan to be felt, that all union of church and state was danger-

ous, both to civil and religious liberty.  That " every impedi-
ment to the utmost liberty of inquiry or discussion, whether it
consist in the fear of punishment, in bodily restraint, in dread
of the mischievous effects of new truths, or in the submission
of reason to beings of like frailties with ourselves, always, in
proportion to its magnitude, robs a man of some share of his ra-
tional and moral nature." (*Mackintosh's Hist. of Eng. ch.* 9.)
The Mosaic law, with all its penalties, even under a theocratic
government, made no progress in the world ; while the Christian
system, if left to its own influences, love, truth and kindness,
and in its apostolic simplicity, it was seen, would inevitably
eradicate error and soften and reclaim the rugged and sinful
nature of man.  It was found that the " insanity of fanaticism
subsides of itself unless heightened by persecution ;" that " con-
sciences are not to be forced, but to be won and reduced by force
of truth, with the aid of time, and use of all good means of in-
struction and persuasion."  " That," in the language of one of the
exhibits in this case, " God alone is the Lord of the conscience,
and hath left it free from the doctrine and commandments of
men." (*Dec. and Testimony, part* 1, 17.)  Those to whom was
intrusted the establishment of our free governments in this new
world, knew the calamitous effects of the struggle between the
sceptre and the crosier in the old ; and resolved that there should
be perfect liberty of conscience here.  In this spirit our consti-
tutions were framed and our laws enacted, and heresy became
unknown to our criminal code.  In Virginia, forty years after
Gov. Gooch's charge, their act " for establishing religious free-
dom" was passed, drawn by Mr. Jefferson, and said by him to
be sufficient " to comprehend within the mantle of its protection
the Jew and Gentile, the Christian and Mohammedan, the Hin-
doo and infidel of every denomination." (1 *Jeff. Works,* 36, 7.)
Our first constitution in this state, in the darkest hour of the
revolutionary struggle, ordained, determined and delared, " that
the free exercise and enjoyment of religious profession and wor-
ship, without discrimination or preference, shall forever hereafter
be allowed within this state to all mankind." (*Const. of* 1777,
*art.* 38.)  Twice since that period have the people repeated this

declaration. (*Const. of* 1821, *art.* 7, § 3. *Const. of* 1846, *art.*
1, § 3.) To this there is no limitation, except that it will not
excuse acts of licentiousness or justify practices inconsistent with
the safety of the state. This was the organic law when our
first act for the incorporation of religious societies was passed,
and when this church was organized. It follows, that there is
no power in the state, legislative, executive or judicial, that can
interfere with this complete religious liberty. We therefore en-
ter upon the subject with laws, the spirit and genius of which
are, in many respects, unlike those of the parent country. There,
the position of the church was secured by the very first chapter
of the magna charta. As said by Lord Coke in *Cawdrie's case*,
it was the civil power of the kingdom that gave ecclesiastical
discipline its life. And the canon law was recognized and sus-
tained by the statute of 25 Hen. 8. (*See Cawdrie's case,* 5 *Co.*
*Rep.* 1.) And beside this, the statute in relation to charitable
uses, by a broad construction embraces almost every thing of a
religious nature not within the control of the established church.
(*Hill on Trustees,* 452.) While here all our courts can do, as it
appears, must be referred to the rights of property. Some En-
glish decisions, but with much hesitation, interfere upon this
ground. One of the earliest was before Lord Keeper North, in
1684. A clergyman of the Church of England gave £600 to
the pious Baxter, to be distributed by him to sixty pious ejected
ministers, not because of their nonconformity, but because he
knew them to be pious and good men, and in great want; and
also £20 to Mr. Baxter, and £20 more to be laid out in his book
entitled "Baxter's Call to the Unconverted." One ground urged
against the bequest was, that it would certainly encourage and
keep up a perpetual schism in the church, which the law would not
endure. And his majesty having declared his pleasure that it
should be applied to the building of Chelsea College, the court
adjudged the charity void, and so decreed. (*Att'y General* v.
*Baxter,* 1 *Vern.* 248.) But this decision was reversed in the house
of lords, the year after the revolution. Lord Eldon professes to
give the reasons of the reversal in *Moggridge* v. *Thackwell,* (7
*Ves.* 76.) I suspect, however, the reversal is better attributable

to the more liberal views known to have obtained after that great event.   One of the most important cases in which equity has interfered, is that of the *Att'y General* v. *Pearson*, (3 *Meriv.* 353.)   There the property, as early as 1701, was conveyed in trust *for the worship and service of God*.   And if meetings for that purpose should be prohibited by law, then to sell and lay out the avails in certain charitable uses.   And in case any trustee should misbehave himself in the management of the trust, or do any thing scandalous or offensive to the rest, they should have power to remove him, and a majority of the trustees were authorized to fill vacancies.   A school house, vestry and meeting house were built on the premises by voluntary contributions.   The legal title had been transmitted to successive trustees.   In 1720 another piece of land was deeded in trust for the support of a minister, and in that conveyance it was provided that if any of the trustees should die, or desert the congregation, or becom of any other religion or persuasion whatever, contrary or different from the then congregation, the trustees were to fill his place. The founders were Presbyterians, but for some years before the end of the last century, the trustees, ministers, and a majority of the congregation had ceased to be Trinitarians.   A bill was filed and the case was partially decided in 1817.   It came up on a motion to stay proceedings in ejectment.   The chancellor referred it to a master to inquire in whom was the legal estate, and what were the nature and particular object, with respect to worship and doctrine for the observance, teaching and support of which each of the funds was created, and what was the usage as to election of the minister among the Protestant dissenters ; and in 1822 a similar decree for an account was ordered, but neither was drawn up.   The court held, that a fund raised for the support of Trinitarian, could not be diverted to that of Unitarian doctrines.   In 1835 another bill was filed, and Sir L. Shadwell, then vice chancellor, also decided that the property ought not to be applied to the support or teaching of the doctrines of any sect of Protestant dissenters who deny the doctrine of the Holy Trinity or profess opinions as to the Christian religion, which, at the time of the erection of the meeting house, could

not be legally taught or preached therein.    He also removed the trustees, because they maintained opinions which, according to the view of the court, ought not to be preached in the chapel, "for there is a manifest incongruity in having persons of one strong religious belief, administering a trust created in favor of persons of another religious belief," and also directed others, who did profess those doctrines and opinions, to be appointed. (*Attorney Gen.* v. *Pearson,* 7 *Sim.* 290.)

Another leading case in England was one arising out of the charities founded by Lady Hewley.    It was decided by the same vice chancellor, in 1833, was argued on an appeal before Lord Brougham, assisted by Justice Littledale and Mr. Baron Parke in 1834, but not decided ; and re-argued before Lord Lyndhurst, assisted by Mr. Baron Alderson and Mr. Justice Patterson, in 1835, and decided in 1836.    (*Attorney Gen.* v. *Shore,* 7 *Sim.* 309, *n.*)    And was argued on appeal in the house of lords in 1839, and affirmed there in 1842.    (*Shore* v. *Wilson,* 9 *Clark & Finnelly's P. R.* 355.)    Lady Hewley was a Presbyterian, and conveyed lands to trustees by two deeds, one given in 1704 and the other in 1707, for the purpose of assisting poor and godly preachers of Christ's holy gospel, and the widows of such, and to assist in the education of young persons designed for the ministry of Christ's holy gospel ; and for encouraging and promoting the preaching of Christ's holy gospel in such poor places as the trustees should think fit, and for the relief of poor and godly persons in distress.    In case of the death of a trustee, his place could be filled by the survivors.    The first deed reserved the power to revoke the trusts and declare new trusts.    The second deed was for the same objects, and also established a hospital or habitation for poor people, to be subject to certain rules, one of which was, that none of evil report be admitted, but such as were poor and piously disposed and of the protestant religion ; another was, "Let every almsbody be one that can repeat by heart the Lord's prayer, the creed and ten commandments, and Mr. Edward Bowles' catechism."    The attorney general said a Unitarian could repeat Bowles' catechism.    The Bishop of London said : "An Arian may, but not a Unitarian."    The effect

of the vice chancellor's decree was to exclude Unitarians from participating in the benefit and administration of the charity; and he removed the trustees because they were of that religious belief. And Lord Lyndhurst, in affirming the judgment, said, "These circumstances, with others, lead me therefore to the conclusion, not merely that these parties have misapplied the funds, but that, in the exercise of their trust, they have manifested a strong and undue leaning in favor of persons of their own persuasion. I think then, looking at these circumstances and considering the extensive and continued misapplication of the funds which has taken place, and adverting also to the consideration of the danger of future abuse, if persons maintaining one particular class of opinions are to be intrusted with the management and entire control of funds which are to be applied for the benefit of persons maintaining other opinions, that I am bound to come to the conclusion that the vice chancellor was correct in removing the trustees." The house of lords, after hearing the seven judges, affirmed the decree; Lord Cottenham and Lord Brougham, only, making brief remarks, and they refused, on the recommendation of those two lords, to declare "what description of persons are hereafter to be considered proper objects of the charity." Lord Cottenham remarking, it might promote and not prevent litigation, and that it was impossible, *a priori*, to foresee the consequences of any such declaration. These may be considered the two leading cases in England, but several others have been there adjudged.

*Craigdallie* v. *Aikman* was decided in the house of lords in 1813. (1 *Dow's P. C.* 1.) Certain persons, as early as 1733, and who adopted the principles of the secession from the Church of Scotland, which took place in 1737, and adhered and submitted to a secession judicatory, had provided a chapel for worship. There was no special contract of adherence, but the judicatory had continued to regulate and direct the use of the chapel until 1795. In 1795 a difference of opinion arose, and a majority of the congregation, as well as the synod, adopted the new views, though a majority of the money contributors to the chapel adhered to the old, and declined the authority of the judicatory. The question was to

which party the chapel belonged.   The court of session in Scotland decided in favor of those adhering to the judicatory, but the house of lords, not being satisfied with this decision, sent the case back for review.   Lord Eldon thought the court could not take notice of religious opinions with a view to decide whether they were right or wrong ; but they might notice them as facts, with a view to decide upon the ownership of property. He added: "If it were distinctly intended that the synod should direct the use of the property, that ought to have been matter of contract, and then the court might act upon it, but there must be evidence of such a contract, and here he could find none."

*Galbraith* v. *Smith* was decided by the court of session in Scotland, in 1837.   (15 *Cases in Court of Session,* 819.) The church judicatories of a dissenting body, having pronounced a sentence declaring a minister of their body out of connection, joint possession was awarded to the claimants until a decision should be made.   A secession church had joined a certain presbytery, but a minister they had called being deposed, and the decision of the presbytery affirmed on appeal, the struggle was for possession of the chapel.   Lord Meadowbank said, "I take it to be clearly and finally settled that a trust may be legally established, and a civil right created, for behoof of a body of dissenting Christians professing certain tenets, and agreeing to have their civil rights fixed by and dependent upon the observance of such rules and regulations as are inherent in, and calculated to maintain the principles they support."   And "that it is a legal object of such a trust, that it may profess to be constituted with a view to perpetuity even, by placing in the hands of a recognized body the right and power of controlling and modifying these rules and regulations in conformity with the fundamental principles of that sect of dissenting Christians to which those constituting the trust may have professed to adhere, and that a civil court will not take cognizance of the proceedings and determinations of those ecclesiastical judicatories, as they may be termed, upon matters of doctrine and discipline, but hold them to the *probatio probata* of the principles of the sect."   He further stated that the deed need not declare all the

conditions of trust, but these could be ascertained by facts and circumstances. And he concludes, " that in order to confer upon a party the right of enforcing the objects of the trust, it is only essential that he should possess a *persona standi in judicio,* and qualify an interest to have it enforced. But it is not required—and that is the point, which, though now settled, was originally doubted—that in those cases, where the parties contributing their money and their means to the constitution of such a trust, and forming a congregation of dissenting Christians, shall have differed in opinion, and both claimed possession of the trust estate, the success of either will depend, not upon the greater amount which each shall have contributed in the creation of the subject, or in their numerical superiority, but in their adherence to the original principles which it was their professed object to maintain in the constitution of the trust." These principles he considered settled by the cases of *Aikman* v. *Craigdallie,* and of *Auchincloss,* decided in 1792.

In *Porter* v. *Clarke,* (2 *Simons,* 520,) the conveyance was to trustees " to permit and suffer the said messuage tenement and meeting house building and premises, to be used as and for a place for the worship of Almighty God by the congregation of protestants dissenting from the Church of England, under the denomination of particular baptists, holding the doctrines of personal election, imputation of original sin, effectual calling, free justification, and final perseverance of the saints, and by the members and successors of the same congregation of protestants holding the same doctrines." There was no endowment for the minister, nor any trust property except the chapel and premises, and the minister was supported solely by voluntary contributions of those attending the chapel. The plaintiff had been minister for thirty-seven years, and had been dismissed. The court thought there was no cause for interference.

*Milligan* v. *Mitchell* came before Lord Chancellor Brougham in 1833, and before Lord Chancellor Cottenham in 1837. (1 *Myl. & Keen,* 446. 3 *Myl. & Craig,* 72.) And also came up on questions of practice at other times. ( 1 *Id.* 433, 511.) About 1798 the Scotch Presbyterian Chapel at Woolwich, being

Robertson *v.* Bullions.

in a dilapidated state and too small, contributions among those belonging to the Scotch Church and under the authority of the London Presbytery, were made, with which a new site was obtained and a chapel erected. A lease of the new chapel was given, "upon trust, nevertheless, to be assigned and disposed of as the said elders and trustees or the elders and trustees of the Scotch Church at Woolwich for the time being, should appoint ; and until such appointment should be made, upon trust to permit and suffer the same to be used as a place of religious worship, and for such other purposes as by the custom of the Church of Scotland the same ought to be used." And the trustees were "not to permit the same to be had or used for any other purpose than religious worship, and for such other meetings and assemblies as by the custom of the Kirk of Scotland, ought to be there holden," without the consent of the lessors, &c. What was called the Drake donation, was for the benefit of the minister of the Presbyterian Chapel at Woolwich. The chapel was opened for divine service in 1800, and in 1803 the kirk session of the congregation made certain laws and regulations, among which was one that no minister should receive a call or be appointed pastor unless licensed to preach the gospel according to the regulations observed in the established Church of Scotland. These laws and regulations were attempted to be repealed in 1833 by the congregation. In 1829 a clergyman was elected and an application was made to the Scotch Presbytery of London to moderate this call, but upon his examination, it was found his tenets were not in conformity with the doctrines of the Church of Scotland, and he declined to sign the confession of faith of that church, and the Presbytery of Paisley, of which he was a licentiate, recalled his license. From this act of the Presbytery of Paisley he appealed to the general assembly of the Church of Scotland, where the sentence was affirmed, and all ministers were prohibited from employing him in their pulpits. When he was first rejected by the Presbytery of London, he withdrew and resigned his claim as pastor of the church, but was again re-elected and preached for a time, and then finally withdrew and the situation was vacant. The prayer of the bill was, that

the premises might be decreed to be held upon trust for religious worship according to the doctrine and discipline of the national Church of Scotland, and that no person was eligible to the pastoral charge of it who was not a licentiate of that church, and that the elders and trustees be decreed to perform the trust and proceed to the election of a pastor duly qualified and authorized to be their minister according to the usages and regulations of the Church of Scotland. Lord Brougham granted an injunction to prevent the election of a person not regularly licensed by the Church of Scotland. But would not order that such, and such only as were licensed, be allowed to preach. But after the hearing Lord Cottenham thought the plaintiffs entitled to the decree asked for. He gave the plaintiffs their costs out of the fund, as a large majority were with the defendants, but did not give costs to the latter.

*Leslie* v. *Birnie* turned upon the question whether the seatholders had a right to vote for a minister. (2 *Russ.* 114.) The chapel had been all along used by a congregation professing the faith, discipline, &c. of the established Church of Scotland, so far as applicable to a church out of Scotland; and had been in connection with the presbytery of the Scotch church in London. The chancellor said the trust was for the congregation, which might mean all that met together at the chapel, or in a more limited sense the members only. That the trust might be well executed if the minister was chosen according to the customs and laws of the Church of Scotland.

*Davis* v. *Jenkins* was also a struggle for the possession of the trust property. The surviving trustee assumed to control it, and the court ordered a reference to a master to inquire into the nature of the establishment and who should elect a minister. It was decided in 1814. (3 *Ves. & B.* 151.)

*Foley* v. *Wonter* was decided in 1820. (2 *Jac. & Walk.* 245.) A new site was purchased on which a new house had been erected, and the deed gave the power of appointing the trustees to the surviving trustees, instead of the congregation at large, as in the first deed. Disputes arose and the parties resorted to equity. Lord Eldon said he had several times been called upon

to execute trusts with respect to these dissenting meeting houses, held under trust deeds, but what the court could do in such cases was very little.   That one of the most difficult questions in these cases is, what is to be the course when the doctrines which it was originally matter of agreement should be inculcated, are not adhered to by the congregation, some of them having changed their religious opinions ; but he adds : " I take it to be now settled by a case in the house of lords on appeal from Scotland, that the chapel must remain devoted to the *doctrines* originally agreed on."

*Attorney Gen.* v. *Drummond* was decided in 1842, (1 *Conner & Lawson,* 210,) and was a struggle before Lord Chancellor Sugden, in the Irish court of chancery, by the Unitarians, to share a fund raised in 1710, to support the Protestant dissenting interests.   One question was upon the kinds of evidence admissible to ascertain the trust.   As to that, perhaps it may be considered settled, certainly in England, that, to a degree, extrinsic evidence is admissible, but not parol declarations of the trust. And it was also decided that the fund was not applicable to the support of Unitarian doctrines.

Several cases in our sister states have more or less raised some of the questions arising in this cause, a few of which I will notice.

*The Presbyterian Church* v. *Johnston,* (1 *Watts & Serg.* 1,) was decided in 1841.   The grant was to trustees " as a site for a house of religious worship, and a burial place for the use of the said religious society of the English Presbyterians and their successors in and near said town of York."   The church had been connected with the Carlisle Presbytery at least 20 years before the deed, and at that date, and until 1838, in all about 73 years.   They then renounced all obedience and subjection to any church judicatory, and so continued for a time, and then formed a connection with the Presbytery of Harrisburgh, of the new school.   They became incorporated after the deed was given.   One of the judges, in his dissenting opinion, insisted that a church could not be presbyterian without being connected with some presbytery, and denied that the new school was presbyterian.   But the majority decided, that a connection with the

Presbytery of Carlisle was not a condition of the grant. Chief Justice Gibson said, that subjection to a particular church judicatory may be made a fundamental condition of a grant; and he mentioned the case of *Duncan* v. *The Ninth Presbyterian Church*, where the grant was " for such congregation of persons as shall belong to the present Reformed Synod to which the Rev. Robert Armand's church in Spruce-street belongs." But that in that case the court was divided and the suit was settled.

The trust in the case of *Chambers* v. *Baptist Education Society*, was for the education of such Baptist preachers and candidates as adhered to the articles of General Union of Baptists in Kentucky, and the court thought the trustees had a sound discretion as to the manner of executing the trust. (*Monroe's Eq.* 216.)

*Deun* v. *Bolton*, decided in 1831, is often cited. (7 *Halst.* 206.) The land was conveyed to the "ministers, elders and deacons of the Dutch Reformed Church in the English neighborhood." The church had been connected with the classis of Bergen and the General Synod, and a portion of them withdrew and formed a connection with the True Reformed Dutch Church, and it was held that the plaintiffs, who had been chosen according to the old form and regulations, and remained, were entitled to the property. This church was incorporated under the statute of New Jersey, entitled " An act to incorporate trustees of religious societies," passed June 12, 1799. (1 *R. L.* 475.) The 12th section of that act declares that the minister, elders and deacons, or if no minister, the elders and deacons of Reformed Dutch Churches, " shall be trustees of the same and a body politic and corporate in law."

In the case of *St. Mary's Church*, (7 *Serg. & Rawle*, 539,) it appeared the ground on which the chapel stood was held in trust for a Roman Catholic congregation, and afterwards a charter was granted to a religious society of Roman Catholics; and the chief justice remarked : "Now if a majority of this congregation should insist upon employing pastors contrary to the rules of the church, and the minority should choose to remain strict Roman Catholics in the sense of the word at the time of their incorporation, what is to become of the chapel and the

ground? That is a momentous question, on which I have not formed any opinion."

The cases in Massachusetts and Connecticut give but little light on the subject, owing to the peculiarity of the semi-established systems under which they arose. In Massachusetts it was decided that a congregational church was not a corporation, nor *qua* corporation, for the purpose of holding property ; and a minority of the church remaining with the parish, was recognized as the church connected with the parish. (*Baker* v. *Fales,* 16 *Mass.* 488. *Stebbins* v. *Jennings,* 10 *Pick.* 172. *Page* v. *Croly,* 24 *Id.* 211.) And to depose a clergyman, there should be an essential change of doctrine, or wilful neglect of duty, or immoral or criminal conduct. (*Avery* v. *Tyringham,* 3 *Mass.* 160. *Burr* v. *Sandwich,* 9 *Id.* 277. And see 16 *Pick.* 274 ; 24 *Id.* 281 ; 5 *Conn. R.* 495.) In the case of *Landon* v. *Plymouth Cong. Society,* (12 *Conn. R.* 113,) a sum of money was raised for the support of the gospel ministry in the society, and the management of it given to the corporation. The corporation undertook to destroy the fund by returning it to the donors and their representatives. The court interposed, on the application of the minority. Ch. J. Williams, in delivering the opinion of the court, said, that were the corporation the donees and their powers unlimited, they would have greater rights over it; but, as trustees, they could not destroy it. That it was well settled, that without the consent of the *cestuis que trust,* or the aid of the court of chancery, trustees can not change the relation at pleasure, and denude themselves of the trust; and cited *Att'y General* v. *Christ's Hospital,* (3 *Bro. C. R.* 165 ;) *Chalmers* v. *Bradley,* (1 *Jac. & Walker,* 68 ;) *Shepherd* v. *McIvers,* (4 *John. Ch.* 136.) The principal case, it will be observed, was one of express trust; and even had the property belonged to the corporation, the majority could not destroy the corporate fund, at least without the consent of all the corporators.

The cases in our own state are not more satisfactory. In the *People* v. *Runkel,* the supreme court held that the trustees of a religious corporation under our statute were entitled to the possession and custody of the temporalities of the church, and law-

fully seised of the estate real and personal. And if the trustees, closed the doors of the church against the minister and congregation, and they broke in by force, they could be indicted for the forcible entry. The court say, that although the property was held in trust for the church or congregation, yet it was in their possession, and the courts would protect them against any irregular and unlawful intrusion against their will, whether by the congregation or by strangers. (9 *John.* 147.)

*Diefendorf* v. *Reformed Calvinistic Church*, decided in the supreme court, was an action for a subscription "for the support of the ministry of the said church as long as the Rev. John I. Wack is and remains our regular preacher." Wack had been deposed for immoral conduct, by the classis, and, on appeal to the synod, that sentence was reversed. The court held the relation of minister and congregation was not dissolved; and Platt, J. who delivered the opinion of the court, said the decision of the synod was conclusive. (20 *John.* 12.)

*The Dutch Church of Albany* v. *Bradford*, in the court for the correction of errors, was put on similar ground. There the defendant in error had received a call referring to the rules of church government established in the national synod held at Dordrecht, (1618–19,) and the articles explanatory of the government and discipline of the Reformed Dutch Church in the United States of America, which he had accepted; but was afterwards suspended by the classis for inebriety. He appealed to the synod, but his appeal was not sustained; and finally his pastoral connection with the church was dissolved by the classis. The question was whether he was entitled to his salary after the suspension; the effect of the decisions of the church judicatories in other respects, seems to have been admitted on both sides. (8 *Cowen*, 457.)

*Field* v. *Field*. (9 *Wend.* 394,) was also at law. The action was on a sealed note payable to the plaintiff, "treasurer to the purchase-meeting-school-fund or his successor." The dispute grew out of the division of the Friends into Orthodox and Hicksites. The court decided that the person appointed in "the old mode" was the treasurer. And Nelson, J. remarked that a court

of law could only look to the legal rights of the parties to control the fund in question, and they must depend upon the constitution and principles of the association and their modes of proceeding : and that equity would interfere if there were a diversion of the fund from its original purpose ; and he cited *The Attorney General* v. *Pearson,* (*supra.*) The real question in this case was as to the appointment of officers, who, it was decided, must be appointed in the mode in use in that society. The society was not incorporated.

*The Baptist Church of Hartford* v. *Witherell* was the first cause that came before Chancellor Walworth involving these questions. (3 *Paige,* 296.) It was a motion for an injunction, and most of the facts appeared by the bill, and were not controverted. A deed of the land was given to the "elder or minister, deacons, wardens, and their successors in office, of the First Baptist Church in Hartford," in 1813 ; and a church erected upon the premises soon after. The society remained unincorporated until 1831. The adherents of the defendant Witherell, who were in the majority, were incorporated in September, 1831, and the minority, represented by the complainants, claiming to be the corporation, endeavored to be incorporated about two months after. The defendants were charged with unchristian conduct. The Washington County Baptist Association, which, as was alledged and not denied, was the regular tribunal, constituted by all the Baptist churches in Washington county, to take cognizance of and decide all ecclesiastical questions of that and the like nature, and whose decision was final unless appealed from, had decided that the minority constituted the regular church. The defendants, after this decision, wholly withdrew from the fellowship of this association, and had put the complainants out of possession, although those represented by the latter owned two-thirds of the pews. The chancellor decided that the trustees appointed by the defendants had a right to the possession of the property, and he remarked that "the complainants appear to have acted on the supposition that the decision of the ecclesiastical judicatory, that a certain portion of the members of the Baptist church in Hartford were heterodox in doctrine

Robertson *v.* Bullions.

or practice and were not the true church, must have a legal effect upon the incorporation of the members of this religious society. But I apprehend that in this they have overlooked the distinction between the congregation and the church, strictly so called, which comprises only a part of the congregation or society. The church consists of an indefinite number of persons of one or both sexes, who have made a public profession of religion, and who are associated together by a covenant of church fellowship for the purpose of celebrating the sacrament and watching over the spiritual welfare of each other. But a religious society or congregation, as recognized by the 3d section of the statute providing for the incorporation of religious societies, is, with us, what is usually denominated a poll parish in some of the neighboring states. It consists of a voluntary association of individuals and families, united for the purpose of having a common place of worship, and to provide a proper teacher to instruct them in religious doctrines and duties, and to administer the ordinances of baptism, &c. Although a church or body of professing Christians is almost uniformly connected with such a society or congregation, the members of the church have no other or greater rights than any other members of the society who statedly attend with them for the purposes of divine worship. Over the church as such, the legal or temporal tribunals of this state do not profess to have any jurisdiction whatever, except so far as is necessary to protect the civil rights of others, and to preserve the public peace. All questions relating to the faith and practice of the church and its members, belong to the church judicatories to which they have voluntarily subjected themselves. But as a general principle, those ecclesiastical judicatories can not interfere with the temporal concerns of the congregation or society with which the church or the members thereof are connected." That the council or association could not remove a minister without the consent of a majority of the congregation, or if incorporated, of the trustees. That he was inclined to think the trustees could be called to account for a misapplication of the funds, "but it must be a most plain and palpable abuse of power, which will induce this court to interfere as to any dispute grow-

ing out of religious or sectarian controversies." Of the case of
*The Att'y Gen.* v. *Pearson,* he remarks, that "it must be re-
collected that the chancellor was there administering the equity
of the statute, (43 *Eliz. c.* 4,) relative to charitable uses, which
statute is not in force here." That if the original founders be-
lieved the sabbath divine, and the defendants taught a different
doctrine, he presumed Lord Eldon would consider this case such a
departure from the original trust as would justify his interference,
but that he was not "prepared to say that it would be right or
expedient to adopt the principle of Lord Eldon here, where all re-
ligions are not only tolerated, but are entitled to equal protection,
by the principles of the constitution. Upon Lord Eldon's princi-
ple, a society of infidels who had erected a temple to the Goddess
of Reason, could not, upon the conversion of nine-tenths of the so-
ciety to christianity, be permitted to hear the word of life in that
place where infidelity and error had once been taught. And
upon the same principle, the newly created equity jurisdiction
in a neighboring state, might find itself constrained to order
some of the parishes within its limits to employ religious teachers
who should inculcate the doctrine of witchcraft as it was taught
in their churches at the time of their first organization." This
case was decided in 1832, and may be considered the first, giv-
ing a construction to our statute in relation to religious corpo-
rations, directly upon the questions now presented. Senator
Colden, in *The Dutch Church of Albany* v. *Bradford,* depre-
cated the interference of lay courts with the decisions of eccle-
siastical tribunals. But in that case and the cases there cited,
including that of *The First Religious Society of Whitestown*
v. *Stone,* (7 *John.* 115,) as well as the other cases to which we
have now referred before Witherell's case, these points had only
arisen incidentally.

The chancellor again, in *The Reformed Protestant Dutch
Church in Garden-street* v. *Mott,* sustained the title and power
of the trustees to and over the temporalities of the society, even
to alienation. He added, that the court of chancery in this
state, independent of the English statute in relation to charita-
ble uses, which he said was never acted upon in this state, had

original jurisdiction to compel the performance of a trust. (7 *Paige*, 77.) This was a case of express trust.

This was followed by the case of *Lawyer* v. *Cipperly*, decided in 1838, (7 *Paige*, 281.) The complainants were a clergyman and a part of the elders and deacons of Zion Church, an incorporated Lutheran society, and they sought to restrain the defendants, who were the trustees of the corporation, from depriving the complainants of the enjoyment of the property, and the use of the church belonging to the corporation. Lawyer claimed to have been duly nominated by the church council and elected, by the majority of the male members of the church and congregation; but the defendants, the trustees, refused to allow him to preach, and denied the regularity of his election, and insisted that he and his adherents had abandoned the faith and doctrine of the evangelical Lutheran church, by refusing to adhere to the Augsburgh confession of faith; and had withdrawn themselves, and were endeavoring to withdraw the church, from the Hartwick Synod : a superior church judicatory to which Zion's Church had attached itself many years before. The society was incorporated under the act of 1784. The chancellor adverted to and reaffirmed his views in Witherell's case; and said the church or spiritual body, as to its doctrines, government and worship, is to be governed and regulated by its own peculiar rules, which neither the trustees nor the congregation have any right to interfere with or alter without the consent of the church itself; and declined to pass upon the question, whether a church, as such, has a right to change its government, discipline or mode of worship, or standards of faith with the consent of the trustees and congregation. That it was not sufficient that a minister should be called and elected by the church or spiritual body according to its general usages, but, if he is to use the house, or enjoy the property of the corporation, "his employment must also be sanctioned by the trustees as the representatives of the temporal rights of the whole congregation. And if he is to receive any support or compensation for his services, either from pew rents or from subscriptions, or other ordinary contributions, by all or any of the stated hearers of the congregation, which subscriptions or contributions for the support

of a settled minister, are a part of the revenues of the congregation or society within the intent and meaning of the statute, the payment of such stipend must also be authorized by the electors at a regular meeting called for that purpose; or the trustees will violate their duty by suffering him to be thus employed and paid." " If," said he, " the trustees, without any reason whatever, should obstinately refuse to employ a minister who was every way acceptable to the great mass, not only of the church but also of the congregation, and who had not in their opinion departed materially from the standards of faith adopted in such church, I am not prepared to say this court would not correct such a flagrant breach of trust by removing them from their office of trustees, so as to allow the congregation to elect others in their places. It must, however, be a case of a palpable breach of trust which will authorize this court to interfere; and it should not be done in any case where the church and congregation were very nearly equally divided as to the propriety of employing any particular person as their minister. And it is the right if not the duty of the trustees to withhold their assent, where there is reason to believe that the employment of the individual selected by a majority of the church, be he orthodox or not, will destroy the peace and harmony of the congregation or of the church." And he held the complainants were not entitled to any relief which it was in the power of the court to give.

And *Paddock* v. *Brown,* (6 *Hill,* 530,) agreed with *Lawyer* v. *Cipperly,* as to the power of trustees in the employment of ministers. There the call was by three elders of a Presbyterian church and one trustee, and contained a promise to pay the salary; but those signing the call were held not personally liable, as it was considered the act of the congregation. This was decided in May, 1844; and in the same month, the eminent jurist who decided *The Baptist Church* v. *Witherell,* and *Lawyer* v. *Cipperly,* decided *Gable* v. *Miller,* (10 *Paige,* 627.)

In *Gable* v. *Miller,* the trustees of a German Reformed Church, which was for a long time in connection with and subject to the judicatories of the Reformed Dutch Church in the United States, attempted to dissolve that connection, and employed German Lutheran pastors without the consent of a large portion of the

church and congregation, or of the classis with which the church was connected, and refused to permit the stated supplies, provided by the classis, to occupy the pulpit. A large mass of proof was taken, and among other things, upon the points whether the doctrines professed by the Lutheran Church were Arminian, and those of the Reformed Dutch Church, Calvinistic; whether those of the Lutheran and German Reformed were similar; and also, whether the German Reformed and Reformed Dutch Churches agreed upon the five controverted points, predestination, particular redemption, total depravity, effectual calling, and final perseverance. The precise time of the connection of this church with the Reformed Dutch Church was not settled; but it was pretty clear that it continued uninterruptedly from 1764 to the revolutionary war, and at times since. In 1765 a new edifice was erected, and the foundation stones, it was alledged, were laid by every member of the consistory and congregation present, with the exclamation, "for a German Reformed Church." The Reformed Dutch Church in America, as early as 1772, by its constitution recognized and declared the doctrines, rules and usages proclaimed by the Synod of Dort. The society was incorporated in 1784 under the general act. The assistant vice chancellor, Hoffman, gave an elaborate opinion and dismissed the bill. The chancellor reversed this decree. He considered that calling and maintaining German Lutheran pastors, was a perversion and misapplication of the corporate property, even though they did not preach the doctrine of their denomination; and so was the employment of a minister, not subject to the supervision of the Reformed Dutch Church. He admitted that, in *The Baptist Church* v. *Witherell*, he had expressed doubts as to the power of the civil courts to interfere. But he thought the cases in England and this country had settled the question in favor of the exercise of that jurisdiction, and cited the cases of *Leslie* v. *Birnie, Milligan* v. *Mitchell, Attorney General* v. *Pearson, Same* v. *Drummond, Of St. Mary's Church, Field* v. *Field,* and *Chambers* v. *The Baptist Education Society,* herein referred to; and also *Clough's case* in the Irish courts. And he

declared the complainants, who had been elected under a sep-
arate organization by those adhering to the Reformed Dutch
Church, to be the true and legitimate board of trustees, and
ordered the defendants to deliver the property to them and not
interfere therewith, and account for the use, and pay costs.
This decree was reversed in 1845 in the court for the correction
of errors, by a vote of 14 to 3. (*Miller* v. *Gable,* 2 *Denio,* 492.)
Four opinions were given in favor of reversal, and one by Sen-
ator Porter, for affirmance. Gardiner, president, said he did not
sympathize with the doubt expressed by the chancellor in *The
Baptist Church* v. *Witherell,* whether "the trustees of a relig-
ious society are independent of all control in reference to doc-
trines and modes of worship;" but "I most cordially agree with
him in opinion, that it must be a plain and palpable abuse of trust
which will induce a court of equity to interfere respecting a contro-
versy growing out of a difference in religious and sectarian tenets.
Between that extreme which confers all power upon the congre-
gation or the trustees, and the doctrine which subjects the prop-
erty to forfeiture for departure from doctrine or forms of gov-
ernment in matters not indispensable to the great ends to be ob-
tained by religious organization, there is a wide interval where we
may take our stand, sustained by the law and by a sober and en-
lightened public sentiment." And he considered the trust not
violated by the application of the property, by the majority, to the
maintenance of the worship of denominations not Calvinistic.
Beers, senator, thought the trustees had nothing to do with
designating the minister, and no right to determine his ortho-
doxy. All they could do was to pay his salary when properly
elected. That they would be guilty of a palpable breach of
trust if they shut the doors upon such person or withheld his
pay, because they deemed him unsound in faith; and he con-
sidered the selection of pastor properly made in that case. Sy-
nopses of the opinions of Senators Barlow and Folsom, are
given by the reporter. Senator Barlow considered a majority
of the church or society, or trustees, if the society be incorpo-
rated, at liberty, without incurring a forfeiture of the prop-
erty, to deviate from the doctrine which prevailed at the time

of the donation, if there be no explicit declaration in the act of donation, that it is to be held for the support of particular doctrines. But where the particular doctrines or objects are in terms expressed, a court of equity will enforce the trust. Senator Folsom thought the deviation in the case, if any, was too slight and unimportant, to warrant the interposition of the court, if such interposition on account of departure from the belief of the founders and benefactors of a church was ever justifiable, which was considered to be a matter of doubt, and the connection with the Reformed Dutch church voluntary ; and that the court of chancery was deprived of jurisdiction by statute. Senator Porter concurred substantially with the chancellor.

From this contrariety of opinions, it is impossible to say upon what ground the members constituting this large majority of the court, put the decision. Whether they considered there was no condition attached to the property ; or that there was no deviation from doctrine or discipline ; or that the deviation was too unimportant for the interference of the court; or that the court had no jurisdiction; does not appear. The first time the chancellor avowed the change in his opinions, and declared the court of chancery to have jurisdiction to interfere to control trustees in reference to doctrine and modes of worship of a religious society, and acted upon that principle, his decree was overthrown by the highest court in the state, by the decisive vote of nearly five to one.

In the cases of *Kniskern* v. *The Lutheran Churches,* (1 *Sandf. Ch. R.* 439,) before Assistant Vice Chancellor Sandford, and *Bowden* v. *McLeod,* (1 *Ed. Ch. R.* 588,) before Vice Chancellor McCoun, this power of chancery was declared to exist on the ground of trust, and in the former case acted upon ; but as both cases were decided before the final decision of *Miller* v. *Gable,* though very ably considered, they must be deemed overruled, so far as they conflict with the latter. *The People* v. *Steele,* decided by Mr. Justice Edmonds in 1848, was an application for a mandamus. (2 *Barb. S. C. R.* 397.) Three Methodist churches united and formed a new church and became incorporated under the general act, built a church by voluntary contributions, and

were admitted into connection with other churches of that denomination by the presiding elder, and received preachers from the annual conference about eight years; when, their preacher having been suspended, they agreed to sustain him and to give him a salary of $1000, and rented to him the parsonage. But the bishop sent another preacher, to whom the trustees refused admittance into the church. A return to an alternative mandamus had been filed, and upon that, application was made at a special term for a peremptory one. The court granted it, and relied mainly, it would seem, upon the case of *Rex* v. *Barker*, (3 *Burr.* 1265; 1 *Bl. R.* 352.) That was an application for a mandamus to admit a dissenting minister, who, it was said, had been duly elected. The trust was "to suffer the meeting house to be for the public worship of God by such congregation of protestant dissenters, commonly called presbyterians, as should sit under and attend the ministry of the said John Enty or such other presbyterian minister or ministers as should be, in his or their room, successively, in all times then coming, be, by the members in fellowship of the said or such like congregation or congregations, regularly and fairly chosen and appointed to be minister or preacher or pastor to preach in the said meeting." The distinguished counsel for the defendant, Thurlow & Dunning, opposed the application with great pertinacity, and would not consent to a new election or an issue, and the court finally, at a subsequent day, granted the writ. They said there was a function with emoluments, and no specific legal remedy. And that the refusal of the defendants to go to a new election or try it on a feigned issue, ought to be prefatory to the rule. That case, probably, would hardly be considered law in this state. (*The People* v. *Stevens,* 5 *Hill,* 616.) But if it can be sustained at all, it must be on the ground that the election of the applicant was in the nature of an appointment under the deed of trust. As a general rule, a mandamus will lie, only, where the party has a legal right and no other remedy. There must be a specific legal right as well as the want of a specific legal remedy. An equitable right will not do, although an equitable right is no objection if there be also a legal one. (*King* v. *Marquis of Stafford,* 3 *T. R.* 646. *Rex* v.

Robertson *v.* Bullions.

*Arch. of Canterbury,* 8 *East,* 213.) And it is well settled that where a lecturer, pastor or other person, is supported by voluntary contribution, there a mandamus will not lie. There must be an endowment and a legal right. (*Porter* v. *Clarke,* 2 *Simons,* 520. *Rex* v. *Bishop of London,* 1 *T. R.* 331. *Same* v. *Same,* 1 *Wils.* 11. *Same* v. *Same,* 13 *East,* 417. *And see Judges of Oneida C. P.* v. *People,* 18 *Wend.* 79 ; *Kendall* v. *United States,* 12 *Peters' R.* 524 ; 4 *Bac. Ab.* 502.) In England, a minister of a dissenting congregation, placed in possession of a chapel and dwelling house by those in whom the legal fee is vested, in trust to permit the chapel to be used for the purposes of religious worship, is a mere tenant at will to the trustees ; and his tenancy is determined *instanter* by demand of possession. (*Doe ex dem. Jones* v. *Jones,* 10 *Barn. & Cress.* 718. *Doe ex dem. Nichols* v. *McKeag, Id.* 721. *And see the strong case of Porter* v. *Clark,* 2 *Sim.* 520.) Though it was intimated by Parke, J. in *Doe* v. *Jones,* that possibly, the defendants had a remedy in equity, if improperly turned out of the chapel by the trustees. If the views of the chancellor as to the duties of trustees in the employment of a minister and the use of the chapel in *The Baptist Church* v. *Witherell,* and *Lawyer* v. *Cipperly ;* and of Assistant Vice Chancellor Sandford in *Cammeyer* v. *United German Lutheran Churches,* (2 *Sand. C. R.* 186 ;) and Senator Beers in *Miller* v. *Gable ;* and the court in *The People* v. *Runkel,* are correct, it is difficult to see how a minister can obtain possession of the church or any part of the temporalities of the corporation by mandamus, under our statute. That custom or usage can not avail against the provisions of the statute, is too well settled to be doubted (*Many* v. *Beekman Iron Co.* 9 *Paige,* 195. *Co. Litt.* 114, *Morey* v. *Leach, Bl. R.* 553. *Noble* v. *Dursell,* 3 *T. R.* 271. 7 *Vin.* 174, 187. *Griffin* v. *Wood, Cro.* 85. 2 *Mod.* 39. 6 *Pet.* 715. 9 *Wheat.* 584. 2 *Cowen,* 707. 4 *T. R.* 750. 3 *Ch. G. Pr.* 56. *Shepherd* v. *Goswold, Vaughn,* 169. 2 *Cowen,* 712. 5 *Hill,* 437. 6 *Id.* 174. 1 *Phil. Ev.* 541.) And it would seem that the Rev. Mr. Wesley, the illustrious founder of Methodism, understood that the trustees in whom was the legal estate, at least

Robertson *v.* Bullions.

at law, could turn the preacher out of the meeting house. (2 *Barb. S. C. R.* 408.)

It is proper to remark, before closing this review of the authorities, that the supreme court of Vermont has recently decided the case of *Smith* v. *Nelson*, growing out of the same difficulties which have occasioned this controversy. Ch. J. Williams delivered the opinion of the court, and came to conclusions, in most respects, diametrically opposite to those entertained by the vice chancellor in this case.

I have thus given a summary of the cases bearing the most directly on the one before us. It will be observed that the most important of those in England were struggles between the Unitarians and Trinitarians; and the two leading cases were upon trusts originating when dissenters were tolerated, (by the toleration act, 1 Wm. & M. ch. 18—1689,) if they believed in the trinity; but for the denial of which they were subject to severe penalties; so that those claiming to retain the property in the cases of *The Attorney General* v. *Pearson* and *The Attorney General* v. *Shore*, as well as in *The Attorney General* v. *Drummond*, supported doctrines, the avowal of which, when the trusts were created, would have been highly criminal by the laws of the land. This fact undoubtedly influenced those decisions, and thus circumstances which can not exist here, had a controlling effect upon the law of that country. The English cases too, were of unincorporated trusts, and so governed by the law of private trusts, and most of them in the nature of charities. They have been decided since our revolution, and in addition to what has been said in the courts of that country and this, their adaptation to the spirit and genius of our institutions has been doubted by our ablest jurists. Mr. Justice Story remarks upon the doctrines laid down in *The Attorney General* v. *Pearson* and *The Attorney General* v. *Shore*, that "no such doctrine has as yet been ever promulgated in America; and from the peculiar circumstances of the country, and the diversity of religious opinions, it is improbable that it ever will be." (2 *Stor. Eq.* 1191, *a*, *n.*) Every case decided in England or in this country, shows that the subject is full of practical difficulties.

Robertson v. Bullions.

We might get along tolerably well, if no case would arise pushing us from the middle ground recommended by Gardiner, president, in *Miller* v. *Gable*.   But the difficulty is in fixing limits and prescribing rules for the exercise of this jurisdiction.   What shall be deemed a departure from the standard of a particular church ?   According to Lord Meadowbank the law takes no judicial cognizance of these doctrines ; they must be proved like other facts.   But what is so much mere matter of opinion. is hardly susceptible of satisfactory proof.   In this case, and also in the case of *Miller* v. *Gable*, as appeared by the case book in that case, the evidence in relation to doctrine and discipline was most painfully conflicting.   The judge must, as a matter of necessity, decide the cause upon theological and ecclesiastical inquiry.   And how is the decree to be carried out ?   Is the minister to conform his discourses to the decision, under the direction and supervision of a master in chancery ?   Chancellor Walworth doubted whether any master could be found possessing the qualifications necessary to decide, whether a singer performed his contract to sing, and ridiculed the proposition.   (*De Rivafinoli* v. *Corsetti*, 4 *Paige*, 264.)   Religious opinions change, and it can not be otherwise, as long as man is an intelligent being, and his opinions and affections susceptible of change.   St. Paul, in vain, besought the early Christians to be " perfectly joined together in the same mind, and in the same judgment."   Luther, though the great Protestant reformer, we are informed by the historian of the reformation, expressed a sentiment, not approved by many protestants of the present day—that he " would rather receive the mere blood with the Pope, than the mere wine with Zuingle."   And the same author admits that " unity in diversity, and diversity in unity, is a law of nature and also of the church."   (*D'Aubigne's Hist. of Ref. b.* 11.)   An eminent writer says " Henry Eighth was a schismatic and no heretic."   In England a clergyman is not at liberty to alter or omit any part of the service.   (*Newbury* v. *Goodwin*, 1 *Phil.* 282.)   But the alterations have been very considerable in this country. (1 *Contributions to Eccl. Hist. of U. S.* 187, 192.   *By Dr. Hawks.*)   Divisions and secessions are constantly taking place.   This as-

Robertson *v.* Bullions.

sociate church, since the secession of Mr. Erskine and his asso-
ciates, according to the testimony in this case, has experienced
several. With all, Christ is, or should be, the *summa rei Chris-
tianæ*, the sum and foundation of the Christian religion. But
in this life, there will probably never be uniform modes of wor-
ship or uniformity of Christian belief. And the same liberty
that allows freedom of thought, permits us to differ. Can the
civil courts interfere in these matters; and, by establishing a
sort of lay-hierarchy, prescribe and enforce rules of conscience,
under the penalty of the forfeiture of property? That would
be in direct conflict with the constitution. Under all the cir-
cumstances, we may well say, with the English chancellor, in
these cases, the courts can do but little. Many of our societies,
particularly where the population is sparse, are weak; and if
the employment of a minister who does not conform in every
particular to the belief entertained by a majority of the original
founders, shall be deemed a breach of trust, it might prevent the
preaching of the word of God in such places, or open a bound-
less field for litigation. And again, individuals may have hired,
as has been done in this case, or purchased pews, in which they
have, at least, a usufructuary interest. (3 *Hill*, 26.) If a mi-
nority, under the sanction of a church judicatory, can excom-
municate the majority, disfranchise them as corporators, and
then elect trustees, the latter can shut the door on the majority
and expel them from the church edifice; and thus strip them
of their property by the action of a church judicatory, without
a trial by jury, and for opinion's sake. In this state it all rests
upon contract. The incorporation is a contract. (2 *Kent*, 306.)
And there can be no forfeiture of its charter, unless judicially
ascertained and declared in a direct proceeding. (*Ang. & Ames
on Corp.* 747, *and cases there cited.*) And the court can inter-
fere for the misapplication of the funds of a religious corpora-
tion, only on the ground that it is a breach of contract, express
or implied. The learned vice chancellor, in his opinion in this
case, puts it upon contract, and impliedly admits that a new
doctrine may be introduced by the unanimous consent of the
congregation. And it must be remembered that in cases under

the third section of the act, the property is held by a corporation, and the corporators have vested rights, not subject to the English law of charitable uses, or, at most, but to a very limited extent. In such cases a court of equity will interfere to prevent the officers of the corporation from misapplying the property contrary to the end and purposes of the institution; because the corporators are, as to the trustees, in a sense, *cestuis que trust*, and such conduct is a violation of the compact, for which there could be no remedy at law, without a multiplicity of suits. (*Robinson* v. *Smith*, 3 *Paige*, 232. *Scott* v. *De Peyster*, 1 *Edw. Ch.* 513. *Verplank* v. *Mercantile Ins. Co.*, *Id.* 84. *Glassington* v. *Thwaites*, 1 *Sim. & Stu.* 124. *Hitchens* v. *Congreve*, 4 *Russ.* 562. 1 *Story's Eq. Jur.* § 667.) And, although it must be a strong case to induce a court to interfere where the act is assented to by the majority of the corporators, yet, if clearly contrary to the design and subversive of the constitution of the association, I have no doubt an objection by a minority would be sustained. And if a society of one denomination become incorporated, I take it that it may be considered designed and constituted for the purpose of advancing the vital doctrines of the Christian faith, professed by that denomination.

Upon this examination of the subject, it seems to me that certain general rules are applicable to these institutions when incorporated under the third section of the act—that chancery has no power to disfranchise one of the members, nor to remove the trustees or declare their election void; nor direct who shall vote; or in any way interfere with their election. This I have already very fully considered; that the trustees may be restrained from wasting the property, and from such management of it as the court can clearly see, unreasonably and unconscientiously deprives the society, or some part of it, of its enjoyment ; and also from applying it to the promotion of tenets clearly opposed and adverse to the fundamental principles of the faith and doctrine professed by the church or society at the time the corporation purchased the property. But the exercise of this jurisdiction should generally be restrictive, and not mandatory; for the statute is their guide and authority for the future, and

Robertson *v.* Bullions.

gives a very broad margin for the exercise of discretion and religious freedom; (*Lord Cottenham in The Attorney General* v. *Shore, in the House of Lords ; Lord Brougham in Milligan* v. *Mitchell ; Lane* v. *Newdigate,* 10 *Ves.* 193 ;) that the support of particular doctrines, or systems of worship or government, or a connection with some particular judicatory, may be made a condition in a grant or donation, but if no such condition be expressed, none should be implied, except as to cardinal points. This last principle, I think, may be deduced from the cases already cited, particularly *The Attorney Gen.* v. *Pearson, Same* v. *Shore, Same* v. *Drummond, Craigdallie* v. *Aikman, Milligan* v. *Mitchell, Porter* v. *Clark, Miller* v. *Gable, Baptist Church* v. *Witherell, Lawyer* v. *Cipperly, The Presb. Church* v. *Johnston.* It is hardly necessary to remark, that in *Dean v. Bolton,* (*supra,*) the office bearers of the church were by statute *ex officio* trustees, and of course, a deposition of the former would be an amotion of the latter. Another general rule is, that the church or spiritual body is authorized to call the minister, either by itself or by some other mode, according to usage. In order to reach the revenues of the corporation, that call must be ratified by the congregation or body entitled to elect trustees, by fixing the salary of the minister ; and then the trustees may apply the revenues to his support.

In the present case I do not think a secession from any particular presbytery or synod would be a palpable abuse. The first connection was with the Associate Presbytery of Pennsylvania, which, it seems, is now nominally extinct. The church or society lost no rights by connecting itself with the Associate Synod of North America and the Associate Presbytery of Cambridge. Nor do I see how it would do so, by connecting itself with any other presbytery or synod of the same denomination, if any other exists. Whether a majority, under our statute, may dissolve all connection with other church judicatories, if there be no change in the fundamental doctrines of their faith, it is not necessary now to decide.

But whether the use of the house by a majority of the congregation under the ministry of the defendant, Dr. Bullions, is such

an act as that the minority can complain in this court, and ask for restrictive measures, is a point of much difficulty. I do not understand that any error in matters of mere faith, is imputed to him or them. Much was said on the argument respecting the manner of his deposition from the ministry. It is contended, among other things, that the act of the presbytery was irregular and void, not only because it was by a minority of the ministers composing it, a ministerial majority being necessary, but because the four clerical members remaining, after the votes of four others had been rejected, were the accusers of Dr. Bullions in the case. It is also insisted that he could and did protest against and decline their authority, and appeal, and thus suspend their powers ; that the proof was altogether insufficient ; and that the proceedings were so conducted and the sentence so unjust, that they may be deemed not consonant with the word of God, and may be disregarded without being sinful in His sight. (*Conf. Faith, ch.* 1–10, 31–3, 4. *Dec. & Tes. p.* 1–17. *Church Gov. and Dis. p.* 3, *art.* 12. *Perdivan,* 195.) This argument, perhaps under the peculiar circumstances of this case, would be apposite, were it not for the appeal to the synod by Dr. Bullions himself, which was not sustained. It must be remembered that this associate church adheres to the presbyterial form of government. (*Dec. and Tes. p.* 3, *art.* 8. *Chh. Gov. and Dis. p.* 1, *art.* 4 ; *p.* 3, *art.* 12.) And after the cases of *Diefendorf* v. *Reformed Calvinistic Church,* (*supra,*) and *The Dutch Church* v. *Bradford,* (*supra,*) I do not see how we can look beyond the decision of the synod. All the authorities agree, that the civil courts can not, upon the merits, overhale the decisions of ecclesiastical judicatories in matters properly within their province. Dr. Bullions himself, took the case to the synod, and the deposition of a minister is purely an ecclesiastical matter ; though the effect of that deposition upon civil rights, is quite another thing. The church judicatories had power to depose him, but they could not sequester the property of the corporation, nor compel the congregation, against the will of a majority, and the trustees, to receive a minister. The defendants in their answer, admit that a minister who is under

rightful sentence of excommunication, can not be permitted to occupy the pulpit, or administer divine ordinances.  Our courts have, as we have seen, declared that such dissolution of the connection between pastor and flock, discharges the civil contract, even the individual subscriptions for the support of the former.  It is true, a majority of the church in those cases were probably opposed to the minister, but the decisions were not put upon that ground.  Dr. Bullions must, for the purposes of this case, be deemed deposed from the office of the holy ministry; and, notwithstanding a large majority of this enlightened society still consider him in good standing, a minority of the corporators are of the opposite opinion ; and giving full effect to the proceedings against him, insist that his employment is a grievance that deprives them of a reasonable enjoyment of the corporate property, which can be redressed in this court.  And with much hesitation I have come to the conclusion that, upon this point, the law is with them.   True, in *Milligan* v. *Mitchell*, there were errors of doctrine.  But if I am right as to the force of the decision by the synod, Dr. Bullions was not, so far as our action is concerned, a minister of the associate church when this suit was commenced.

It was said on the argument that he had been restored by a presbytery in Vermont.  I find nothing in the books made exhibits in this case, nor in the history of this denomination, that authorizes a deposed minister to go to some other presbytery, with which neither he or his church had before any connection, to be restored.  (*Perdivan*, 194.)  Had the Cambridge Church, before that application, connected itself with that presbytery, the case might have been different.  Without expressing any opinion as to the manner in which it was done, I think, so long as he is under sentence of deprivation, the use of the corporate property should not be devoted to the support of his ministry against the will of any respectable portion of the society.  I speak of the case as it stood at the time of commencing this suit.  If he has been restored by a proper judicatory to which the Church of Cambridge was at the time attached, that is another matter, and not now before us.

This cause is one of importance not only in a legal point of view, but also of vast importance to the church and society interested in this litigation. Perhaps the clerical gentlemen who have been the principal actors in this case, did not duly weigh the consequences, or there would have been more forbearance. Here were five ministers of that peaceful and holy religion, to the truth and value of which all well informed and reflecting minds must assent, having, as they no doubt honestly believed, causes of complaint among them ; but which, with all due allowance, I must think, could and should have been adjusted without delay and without difficulty. But, unfortunately a different course was adopted, and the consequences have been calamitous indeed. The hallowed and mystic union of pastor and his church, cemented and strengthened by the friendship, the communion, and the vicissitudes of thirty years, a period which consigns a generation to the grave, has been dissolved : the ties and associations of Christian brethren and sisters have been severed and broken ; and one portion of the church has expelled or attempted to expel the other from the enjoyments and consolations of the gospel ordinances; striking off over one hundred and fifty at once, of whom more than two-thirds were females ; and finally, one of the most enlightened, benevolent and prosperous religious societies in the land has been rent by the elements of strife, and plunged into sharp and expensive litigation for years. No man should judge another in matters of conscience and duty. But the retrospect in this case is painful in every aspect, and must produce a wish for peace and reconciliation in every benevolent heart.

There must be a decree restraining the defendants from using the temporalities of the corporation for the support of Dr. Bullions' ministry as long as he is under sentence of deprivation. All the other portions of the decree which have been appealed from, must be reversed. Neither party can have costs against the other on this appeal. The complainants have asked too much, and neither side is free from blame. The rule is, where both parties have claimed what they are not entitled to, and each has succeeded as to part of the matters in litigation be-

.tween them, to give costs to neither. (*Crippen* v. *Hermance*, 9 *Paige*, 211.) Nor am I disposed to burden the corporate funds with the costs, except the costs of putting in the answer by the corporation. Each party must in all other respects bear their own.

It was stated on the argument that the complainants, under the vice chancellor's decree, had taken possession of and occupied the church edifice. The defendants, who were trustees at the time of the commencement of the suit, and their successors, are entitled to the possession of the property of the corporation ; but under all the circumstances of this case, there should be no accounting for the mere use of the property.

If there has been waste or destruction of property, that should be made good.

PAIGE, P. J. concurred.

CADY, J. The facts, that the defendants in this cause represent four-fifths of the persons who formed " The Associate Congregation of Cambridge, in the county of Washington, in the state of New-York, adhering to the principles of the Associate Presbytery of Pennsylvania formerly, now the Associate Synod of North America ;" that they have contributed three-fourths of all the money expended in purchasing the property and erecting the buildings, which are the subjects of this controversy ; and that all the property is in the hands of trustees, elected by a majority of the voters who belonged to the said congregation, and who, in all their acts have only obeyed the will of that majority, made me wish to find some legal ground upon which the cause could be decided in favor of the defendants. But I have sought in vain for any such ground. The defendants and those who act with them, contributed liberally for the purchase of lands and a library, and for the erection of a church and other buildings ; and if, when doing so, they dedicated their contributions to a specific purpose, they voluntarily parted with their property, and can no more reclaim it and call it their own, than the man who has contributed $100 to the American Bible Soci-

---

Robertson *v.* Bullions.

---

ety can claim the Bibles which his contribution enabled the society to print, and distribute among the heathen. The inquiry is not, whether the greatest number of members of the congregation act with the complainants or with the defendants; nor by whom the greatest number and most liberal contributions have been made ; but, who are *now* seeking that the fund, which has been swelled up to $13,000 by the contributions of all, shall be applied to the specific purpose for which the donors originally intended it? If that intent can be discovered, the court is bound to carry it into effect.

As early as the year 1785, a congregation was organized and called " The Associate Congregation of Cambridge, *adhering to the Associate Presbytery of Pennsylvania.*" Why these latter words but to furnish evidence to the world of the principles of faith, practice, discipline and government, which the congregation intended to adopt ? The year after the congregation was organized, Jonathan French conveyed to seven persons described as having been " chosen and elected trustees for the Associate Congregation of Cambridge, adhering to the Associate Presbytery of Pennsylvania," half an acre of land, " to hold to the party of the second part and their successors forever, to the sole and only proper use, benefit and behoof of the said Associate Congregation of Cambridge." The grantees took the estate as joint tenants; (*Laws of* 1786, *ch.* 12, § 6 ; 1 *R. S.* 727, § 44 ;) but as the word *heirs* was omitted, they took only an estate for life ; and on the death of the survivor, the estate would at law have reverted to the grantor or his heirs. The same year this conveyance was made, the congregation built a meeting house on the lot. In 1808, Rev. Alexander Bullions, one of the defendants, was ordained and installed as the pastor and minister of the said Associate Congregation of Cambridge ; and the bill alledges, " that on such ordination and installation, one of his vows was answering affirmatively the following question : " Do you engage to submit yourself willingly and humbly in the spirit of meekness to the admonition of this presbytery as subordinate to the Associate Synod of North America ?" &c. The complainants alledge, that in or about the year 1784, " the said

Associate Church of North America, through the said Associate Presbytery of Pennsylvania, adopted and published a particular statement of their principles, in a book commonly called and known as "The Declaration and Testimony of the Associate Church of North America." These principles require every member admitted to communion in said Associate Church solemnly to declare and profess adherence to the Westminster confession of faith, the larger and shorter catechisms, form of Presbyterian church government and directory for the public worship of God, as expounded, received and witnessed for in the said declaration and testimony; and to declare their solemn and fixed promise and resolution, through grace, to continue in the faith as exhibited and declared in said standard, and to be subject to the order and discipline of the said church. And every officer, whether ruling elder or minister, is required by his ordination vows to submit himself willingly and humbly to the church courts of the said Associate Church, to continue steadfast in the principles professed by the said Associate Church, and carefully to avoid every divisive course. Every ruling elder promises in his vows, submission in the Lord to his session ; and every minister to his presbytery, as subordinate to the Associate Synod of North America. That the principles thus adopted, established, published and promulgated, by the said Associate Church, have ever been and still are the principles of the faith and practice, discipline and government of the said Associate Church, and are obligatory upon every officer and member thereof," &c.

The defendants in their answers admit the authority of the book above mentioned, but seek to escape the force ascribed to it by the complainants, by insisting that the submission, mentioned in the ordination vows, is a submission in the Lord—a submission to a presbytery when it acts uprightly—but, when it does not act uprightly, that it is the duty of the individual to refuse to submit, and to contend against and resist such a judgment; and they refer to said book and pray that it may be taken as a part of their answer. This branch of the case will be resumed hereafter.

Robertson *v.* Bullions.

About two years after the ordination of the Rev. Dr. Bullions, Jonathan French and Jane his wife, executed to fourteen persons a deed for the same half acre of land conveyed by him in 1786. The fourteen grantees are described in this deed as "Trustees for the Associate Congregation of Cambridge, in *accession* to the principles presently maintained by the Associate Synod of North America, and now under the inspection of the Associate Presbytery of Cambridge, belonging to the said Synod, and whereof the Rev. Alexander Bullions is the present pastor." Three of the grantees named in this deed, were grantees in the first deed from French; and the conveyance is to the fourteen grantees and to their heirs and assigns forever. They took a fee as joint tenants; but, "to the intent, for the use, and in trust for the members who then were, or thereafter might be, in full communion with, and should compose the said Associate Congregation of Cambridge, in accession to the principles then presently maintained by the Associate Synod of North America, and then under the inspection of the Associate Presbytery of Cambridge, belonging to the said Synod, and for such persons as the said members, at any time thereafter, might elect and choose from amongst themselves as trustees, and their successors in office to be elected and chosen as aforesaid." The deposition of Patrick McGill shows that the probability is that all the grantees named in the first deed from French, are dead; and unquestionably no title at law could now be claimed under that deed. No evidence has been given to show whether any, and if any, how many, of the persons named as grantees in the second deed are now living. If any are yet living, they have the legal title; if all are dead, then the legal title is in the heir at law of the survivor, unless it has been vested in the corporation, as all the parties seem to admit it has. But, be the legal title where it may, the inquiry here is, to what use or trust was it conveyed? The trust declared was for the members who were then, or thereafter might be, in full communion with and should compose the Associate Congregation of Cambridge, in accession, &c. Who were then, or have since become, such members *in full communion?* What must they have done in order to become

such ?   They must, as has been shown, among other things, engage to be subject to the *order and discipline* of said church. And can any thing be more reasonable than to hold, that whenever they refuse to be subject to such order and discipline, they cease to have any right to participate in the charity intended for those who would render cheerful obedience to such order and discipline ?   The "*congregation,*" mentioned in the deed, was understood to be composed wholly of persons *in full communion ;* and it did not then, as the term is now generally understood, include all those who attended divine service in the meeting house or church.   (*See* 3 *R. S.* 207, § 3, 2*d ed.*)   According to the trust declared in this deed, no person could be a *cestui que trust* unless he was a member *in full communion* with the Associate Congregation of Cambridge, in accession to the principles then presently maintained by the Synod of North America, and under the inspection of the Associate Presbytery of Cambridge belonging to said Synod.   The complainants profess to be such members, and to have filed their bill for themselves and all other members of said " Congregation," who adhere to the standards thereof; and the defendants have not denied this.

In November, 1826, the congregation was duly incorporated by the name of " The Associate Congregation of Cambridge, in the county of Washington, and state of New-York, *adhering* to the principles of the Associate Presbytery of Pennsylvania formerly, now the Associate Synod of North America." This was forty-one years after the first organization of the congregation, and eighteen after the ordination of Rev. Dr. Bullions; and the congregation insert in their corporate name their adhesion to the principles by which they were governed at their organization.

The members of the congregation seemed to have lived and prospered harmoniously till April, 1838, when the Presbytery of Cambridge deposed and excommunicated Rev. Dr. Bullions. That act of the Presbytery was, on his appeal, affirmed by the Associate Synod of North America.   But, he, regarding the sentence pronounced by the Presbytery, and affirmed by the

Synod, as unrighteous, has disregarded it, and has refused to yield to the authority of the ecclesiastical judicatories, with which he was connected; and four-fifths of the members of the congregation agree with him and prefer his ministrations to those of any other person.

But the complainants, and some other members of the congregation, believing that submission to the judgment of the Presbytery and Synod, is not only essential to maintain order in the church, but is required by religion itself, still adhere to the principles of faith, practice, discipline and government, as set forth in " the declaration and testimony ;" and they, in their bill, after setting out these principles of faith, practice, discipline and government, which had been adopted by the Associate Congregation of Cambridge, and after describing the various items of property, real and personal, belonging to said congregation, alledge, " All of which property, real and personal, was acquired and accumulated by said Associate Congregation of Cambridge, and ever has been and still is held by the trustees of said congregation, in trust for the sole and only and exclusive purpose of being devoted and appropriated solely and exclusively to the support and maintenance of the preaching and teaching the gospel, and the administration of divine ordinances in said Associate Congregation, according to the aforesaid principles of faith, practice, discipline and government of the said Associate Church of North America, according to which principles no minister, who is under sentence of excommunication, can be permitted to occupy the pulpit, or administer divine ordinances, in said Associate Congregation; nor can any member of said congregation hear the preaching and receive the administration of divine ordinances from a minister under sentence of excommunication, without violating the solemn vows which they took on themselves when they became members of said Associate Church," and which they alledge " they most conscientiously believe would be sinful in the sight of God," &c.

What answer do the defendants, one and all, give to these various allegations? They reply, that " all the real estate was purchased for a valuable consideration ; that no part of the real

estate has been granted or given to said congregation upon condition that the same should be used or kept in any other manner than as the trustees from time to time might deem proper; that all the real estate has been purchased absolutely from time to time, (except one piece,) without any conditions or restrictions, as may appear from the several deeds of conveyance to said congregation, and without any covenant or covenants confining said trustees to any condition, or claiming a reversion of said real estate or any part thereof to the grantors on failure to comply with any particular covenants or conditions; that the contributions made for erecting a brick church, edifice or meeting house, were paid into the hands of the trustees without any condition or restriction imposed upon them, other than the confidence of the donors that the amount was to be applied for religious purposes, and for the building of a church for the benefit of said congregation, in the manner deemed most fit and proper by the said trustees, and without any express or implied condition that the trustees or congregation should remain subject to the Associate Presbytery of Cambridge further than *they deemed to be just, expedient and proper;* and that all the property, real and personal, except as before stated and insisted, has been and still is held by the trustees of the congregation in trust for the sole and only and exclusive purpose of being devoted solely and exclusively to the support and maintenance of the preaching and teaching the gospel and the administration of divine ordinances, in said Associate Congregation, according to the principles of faith, practice, discipline and government of said Associate Church of North America, according to which principles no minister who is under *rightful* sentence of excommunication can be permitted to occupy the pulpit or administer divine ordinances in said Associate Congregation; but they insist and aver, that if any minister is not righteously deposed and excommunicated, or if his congregation *or a majority of them believe the same,* he and they have a right to protest and decline submitting to said sentence, and to hold the same null and void until it is reversed, and that he has a right to continue to preach as a minister; that it is the right and duty of both minister and

people so to do; that this is a right they derive from the very foundation and constitution of their church; that the congregation possess the equal right to attend upon the ministration of such a minister without being sinful in the sight of God, as they conscientiously believe; and that a majority of the congregation has at all times the right to choose and select their own minister, and enjoy his preaching so long as he does not depart *materially* from the standards of faith and practice of said Associate Church in the opinion and conscientious belief of preacher and hearers," &c.

It is evident that the unhappy controversy between these parties has grown out of the excommunication of the defendant, Rev. Dr. Bullions. He and his friends alledge that the sentence of excommunication was unrighteous. Be it so; be it that it was injudicious in a prudential point of view, and that he can conscientiously regard it as unrighteous; that does not alter the fact that he *was* excommunicated by a tribunal having authority to act in the premises, and was expelled from the Associate Presbytery of Cambridge, and no longer regarded as a member of the Associate Synod of North America.

But, the defendants insist, that although Dr. Bullions has been excommunicated and cut off from fellowship with this Presbytery and Synod, he has a right to preach, and perform all the duties of a gospel minister. It may be admitted, that neither the Associate Presbytery of Cambridge, nor the Associate Synod of North America, have any power to take from Dr. Bullions the right or to exempt him from the duty of preaching. Nay more, it may be admitted that it is the duty of men seeking the salvation of their souls, to listen to his preaching. But these admissions would not settle the question in relation to the property in dispute. The most important item of this property has, on the defendants' admission, been held, from July, 1786, until this controversy, by the trustees of the Associate Congregation of Cambridge, in trust for the sole and only and exclusive purpose of being devoted and appropriated solely and exclusively to the support and maintenance of the preaching and teaching the gospel, and the administration of divine ordi-

nances in the said Associate Congregation, according to the aforesaid principles of faith, practice, discipline and government of said Associate Church of North America.   Here we have the admission of the defendants, that the property conveyed by Jonathan French, has, for more than fifty years, been applied and appropriated to a specific charity.   And in addition to this continued use, we have the charity distinctly stated in the deed of 1810, for the lot on which the meeting house stands.

What do the complainants ask?   They ask that the property shall continue to be applied and appropriated as it was for more than fifty years before this controversy commenced ; that it shall be applied and appropriated according to the declared will of the donors.   How has the property been applied and appropriated ?   To support and maintain the preaching and teaching of the gospel, and the administration of divine ordinances, by a minister in regular standing with the Associate Presbytery of Cambridge, and who, by the principles of faith, practice, discipline and government of the Associate Synod of North America, had a right to preach and administer ordinances in its churches.   What do the defendants ask?   They ask for a change ; for an application of the funds to a purpose which no man who ever contributed a cent towards the erection of the church edifice or the lot on which it stands, anticipated or thought of; to have the funds applied to the support of the preaching and teaching of the gospel, and the administration of divine ordinances, by a gentleman, who, by the laws of the Associate Presbytery of Cambridge and of the Associate Synod of North America, has no more right to appear in the pulpit of this congregation of Cambridge and there administer ordinances, than any other gentleman in the state.   The complainants are on the side of order.   They wish to maintain and submit to the laws to which they vowed obedience when admitted members in full communion with the church.   On the other hand, the defendants insist that obedience to those laws is a duty no longer than each man pleases to obey.   This is in effect saying, that there is no rule or law which has been adopted by the Associate Presbytery of Cambridge, or the Associate Synod of

North America, in relation to discipline or government, which has any force, and that any such rule or law, may be disregarded with impunity. So far as the laws of the state are concerned, one man has as good a right to preach as another; and every citizen has a right to listen to such preaching as he pleases. And so every man has a right to give his property to support the preaching of the gospel by any one, or any class of ministers. And should a donor appropriate his charity by will or devise to support the preaching of the gospel by excommunicated ministers solely, no minister in regular standing could have any claim upon the fund so appropriated. And those who choose to listen to the preaching of an excommunicated minister, are entitled, by the laws and constitution of the state, to the same protection in "the free enjoyment of religious profession and worship," as those who attend the preaching of an Episcopal bishop, or the most eminent doctor of divinity in the Presbyterian church. The right of the defendants to attend the ministrations of an excommunicated minister is not denied. Neither the legislature nor the courts have any power to interfere with them in that particular. Nor has this court any right to question the gifts and graces of Rev. Dr. Bullions, or suggest a doubt as to his right to preach the gospel to every creature. But, the question for consideration in this tribunal is, whether he has a right to occupy the pulpit in the church edifice erected on the lot of land described in the deed from Jonathan French and his wife, in 1810, against the wishes of the complainants, and receive as a compensation, in whole or in part, for his services, the rents paid for the pews in that edifice? The trust declared by that deed had then existed twenty-four years, and is in terms confined to the members who then were or thereafter might be in full communion with and should compose the Associate Congregation of Cambridge, in accession to the principles then presently maintained by the Associate Synod of North America. The court has no power to declare a new trust or charity. All it can do, as to the church edifice and the lot on which it stands, is to ascertain and decide whether the complainants or the de-

fendants are the persons described in that deed as the benefi-
ciaries, or *cestuis que trust.*

· The defendants insist, that they are a large majority of the
persons who, previous to the excommunication of Rev. Dr. Bul-
lions, formed the Associate Congregation of Cambridge; that
the trustees who were then in office, and those since elected by
the defendants, are the trustees of said congregation; and that
the trustees have the right to appropriate the funds and all the
property which did belong to the congregation, as the majority
of the corporators may direct.   If this claim can not be main-
tained, the defence must fail.   There is some reason to doubt
whether the title to the lot on which the church edifice stands,
ever passed to the trustees of the corporation.   But, assuming
that it did, the trustees took it charged with the same trust
which it was subject to in the hands of the grantees named in
the deed of 1810; and it will, I believe, be difficult for any one
to read that deed and adopt the opinion that the rents and
profits may be legally or equitably applied to support a min-
ister, who, however worthy he may be, has been excommuni-
cated by the Associate Presbytery of Cambridge.   The charity
is in terms confined to members in full communion with a con-
gregation, in accession to the principles then presently main-
tained, by the Associate Synod of North America, and then
under the inspection of the Associate Presbytery of Cambridge
belonging to said Synod.   This Presbytery, and this Synod,
still exist.   But the defendants do not claim that they compose
either the whole or a part of the Associate Congregation of
Cambridge, which is now under the inspection of this Presby-
tery, which belongs to this Synod, which Presbytery and Syn-
od existed when this charity was declared, and still exist.
They do not, therefore, show themselves to be the beneficiaries,
or *cestuis que trust* described in the deed, or in any way enti-
tled to a participation in that charity.

Other parcels of land have been conveyed to trustees or to
the corporation, by deeds in which the trust is not so particu-
larly specified; and in relation to these there might be more
difficulty in saying who were the beneficiaries, had it not been

for the admission made by all the defendants, that all the prop-erty had been held for the same purposes.

In the case of *Miller* v. *Gable,* in error, (2 *Denio,* 540,) Gardiner, president, who gave the leading opinion, says : "When the trust is declared in writing, and its nature and extent clearly defined, the court has no alternative but to carry it into execution." This would seem to be sufficient so far as respects the lot on which the church edifice stands. In the same case, Barlow, senator, says : " When property is in terms conveyed upon trust to support a particular form of worship, or to provide for the teaching of the doctrines of a particular denomination of Christians, the court of chancery will enforce such trust and prevent a perversion of the property to other purposes." And Gardiner, president, at pages 546 and 547, says : " Again, if we are to assume that a German Reformed Church *implies* subordination to the Dutch Reformed Church, under the government of a consistory, classis and synod, because this church was in that connection in 1763, then it is a part of the trust, that such government shall be adhered to in all its parts as it then existed." In the case now under consideration, subordination to the Associate Presbytery of Cambridge and the Associate Synod of North America, is in terms made a part of the trust ; and if the defendants can not conscientiously submit to the discipline and government of the said Presbytery and Synod, it would seem most reasonable that they should not claim to participate in the benefits of a charity which was intended for the exclusive benefit of those whose consciences will allow them to submit to such discipline and government. At page 548 of the case above cited, Gardiner, president, says, in relation to grants made to churches in general terms : " In those cases, the corporate or denominational name, in connection with the contemporaneous acts of the corporators, may be a sufficient guide as to the nature of the trust in respect to *doctrines* esteemed fundamental." May not the same species of evidence be resorted to for showing what form of *discipline and government* the charity was intended to encourage ? In this case, as has been shown, the corporate name refers to the principles by which the corporators

were to be governed, and the beneficiaries in each of the con-veyances are described as in *accession,* or as *adhering* to the principles of the said presbytery and synod. These circum-stances, in connection with the admissions of the defendants above mentioned, as to the trust for which all the property has ever been held, leave no ground for holding that a part of the property is held for one trust and a part for another.

Should a religious congregation be incorporated, and convey-ances made to it without any declarations of trust, the rule in-sisted on by the defendants would apply, to wit, that a majority of the corporators or trustees would have a right to apply the property to such religious purposes as they deemed proper, un-less it should be so long used for a specific purpose as to furnish evidence that it was originally dedicated to that purpose. But, in this case, the trust is so clearly and fully established, that neither a majority of the corporators, nor the trustees, have a right to di-vert the fund from the object to which it was originally dedi-cated, and has been so long applied.

Upon the question whether the sentence of excommunication against the Rev. Dr. Bullions was void, I shall only refer to the opinion of the vice chancellor. Whether the proceedings against him were marked with all that kindness and brotherly affection which ought to characterize a Christian judicatory when dealing with an erring brother, and whom they ought, if possible, con-sistently with the glory of their Master, to forgive " seventy times seven," is not for this court to determine. It is enough, so far as the duties of this tribunal are concerned, to say that he and the other defendants are no longer the beneficiaries described in the *habendum* in the last deed given by Jonathan French, and are not now among the *cestuis que trust* for whom the whole property has uniformly been held.

The decree of the vice chancellor must be affirmed, except that part of it in relation to the removal of the defendant trus-tees. Instead of a decree removing them from office, they must be decreed to deliver over the property which was in their hands as trustees when the bill was filed, and to account for the in-come thereof to such trustees as have been or shall be chosen

by the complainants and other members of the Congregation of Cambridge, as subordinate to the Associate Synod of North America.

Decree restraining the defendants from using the temporalities of the corporation, for the support of Dr. Bullions' ministry, as long as he is under sentence of deprivation. All the other portions of the decree which were appealed from, reversed; without costs to either party as against the other, upon the appeal.

———————◆———————

CLINTON GENERAL TERM, July, 1850.     *Willard, Hand, and Cady,* Justices.